Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/02/2021 08:11 AM CDT

WAYNE L. RYAN REVOCABLE TRUST ET AL., APPELLEES,
v. CONSTANCE "CONNIE" RYAN, APPELLEE,
AND STRECK, INC., APPELLANT.

___ N.W.2d ___

Filed April 9, 2021.    No. S-19-951.

1. **Equity: Stock: Valuation.** A proceeding to determine the fair value of a petitioning shareholder's shares of stock is equitable in nature.

2. **Equity: Appeal and Error.** An appellate court reviews an equitable action de novo on the record and reaches a conclusion independent of the factual findings of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Statutes: Appeal and Error.** Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.

4. **Prejudgment Interest: Appeal and Error.** Awards of prejudgment interest are reviewed de novo.

5. **Judgments: Evidence.** A trial court in a case tried to the court without a jury may adopt a party's proposed findings of fact verbatim provided that the findings and conclusions reflect the court's independent view and judgment of the evidence.

6. **Judgments: Evidence: Appeal and Error.** Although findings drawn by the trial court itself are more helpful to the appellate court, findings prepared by counsel and adopted verbatim by the trial judge are formally the judge's and will stand if supported by evidence.

7. **Judgments: Appeal and Error.** The adoption of a party's proposed findings does not require an appellate court to set aside the deference ordinarily given to the trial judge's factual findings.

8. **Judgments: Evidence: Appeal and Error.** When accepting a party's proposed findings, minor mistakes that do not prejudice a party constitute harmless error; however, a trial court may commit error if the proposed facts or law are unsupported by the evidence and cause prejudice. The critical inquiry is whether such findings, as adopted by the court, are clearly erroneous.

9. **Corporations: Stock: Valuation.** A determination of fair value of corporate shares in an election-to-purchase proceeding following a shareholder's petition for dissolution of corporation is to be based on all material factors and elements that affect value, given to each the weight indicated by the circumstances.

10. \_\_\_\_: \_\_\_\_: \_\_\_\_. The real objective in determining the fair value of corporate shares is to ascertain the actual worth of that which the shareholder loses. Under this analysis, the court may consider the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.

11. **Expert Witnesses.** The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.

12. **Corporations: Stock: Valuation.** The trial court is not required to accept any one method of stock valuation as more accurate than another accounting procedure.

13. **Corporations: Valuation.** A trial court's valuation of a closely held corporation is reasonable if it has an acceptable basis in fact and principle.

14. **Corporations: Stock: Valuation: Expert Witnesses.** A judicial valuation of corporate stock presents unique challenges which are complicated by the clash of contrary, and often antagonistic, expert opinions of value, prompting the trial court to wade through widely divergent views reflecting partisan positions in arriving at its determination of a single number for fair value.

15. **Corporations: Stock: Valuation: Evidence.** While discharging its statutory mandate to value a shareholder's stock, it is entirely proper for a trial court to adopt one expert's model, methodology, and calculations if they are supported by credible evidence and the judge analyzes them critically on the record.

16. **Corporations: Stock: Valuation: Appeal and Error.** As long as they are supported by the record, an appellate court may defer to the trial court's factual findings in a statutory corporate stock valuation proceeding, even if the appellate court might independently reach a different conclusion.

17. **Corporations: Stock: Valuation.** The valuation of corporate shares is to be made without consideration of any increase in value resulting from the transaction itself.
18. **Statutes: Appeal and Error.** Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.

Appeal from the District Court for Sarpy County: Nathan B. Cox, Judge. Affirmed.

Thomas H. Dahlk and Victoria H. Buter, of Kutak Rock, L.L.P., and Ronald E. Reagan, of Reagan, Melton & Delaney, L.L.P., for appellant.

Kamron T.M. Hasan, David A. Lopez, and Marnie A. Jensen, of Husch Blackwell, L.L.P., for appellees Wayne L. Ryan Revocable Trust et al.

Daniel J. Welch and Damien J. Wright, of Welch Law Firm, P.C., for appellee Constance "Connie" Ryan.

Heavican, C.J., Cassel, Funke, Papik, and Freudenberg, JJ.

Funke, J.
The sales process implemented by a corporation's successor president and chief executive officer (CEO) failed to produce an offer acceptable to the majority shareholder. When the corporation was not sold, the majority shareholder sued the president and CEO, as well as the corporation, alleging shareholder oppression and breach of fiduciary duty. The corporation elected to purchase the petitioning shareholder's shares, which initiated a valuation proceeding in district court. The court held a 9-day bench trial and determined the fair value of the shares to be purchased by the corporation to be $467 million. The court awarded the petitioning shareholder approximately $256 million in prejudgment interest and, over

objection, ordered the corporation to pay the fair value portion of the judgment within 10 days.

The corporation, Streck, Inc., appeals the court's valuation of shares, award of prejudgment interest, and order to make payment. Based on the record and credibility findings of the district court, and the statutory law governing prejudgment interest in a proceeding to value a petitioning shareholder's shares, we conclude that Streck's appeal is without merit. Therefore, we affirm.

## I. BACKGROUND

### 1. Parties

#### (a) Streck

Streck, a closely held, private family business, is a Nebraska corporation with its principal place of business in La Vista, Sarpy County, Nebraska. Streck is a subchapter S corporation under the Internal Revenue Code.

Streck is a worldwide industry leader in developing and manufacturing cell stabilization technology for use in hematology, immunology, and molecular diagnostics. Streck's products are used to control and calibrate laboratory instruments that analyze blood cells and DNA, and they have a significant impact in health care. When Dr. Wayne L. Ryan founded Streck in 1971, Streck's core business was hematology controls. Streck was "'first to market'" with a majority of its products, and it maintains approximately three-quarters of the hematology control market in the United States. Dr. Ryan subsequently developed a blood collection tube (BCT) product, which allows for the preservation and transportation of blood samples. The BCT products' capability to stabilize "DNA and . . . RNA" was a significant advancement in the field of molecular diagnostics. In addition, Streck's flow cytometer identifies white blood cells, which allows for the diagnosis of diseases, such as AIDS and various cancers.

Streck, with its 330 employees and 200,000 square foot facility, has a fully integrated business model for its products,

with research and development, manufacturing, and distribution. Streck has a strong operational performance, increasing sales every year since inception with no product recalls in the past 25 years. Streck has deeply entrenched relationships with its largest customers that are secured with long-term contracts. Streck has a valuable portfolio of intellectual property, with, as of December 2014, 42 patents and 42 pending patent applications. Streck has an intellectual property strategy, with both offensive and defensive strategies, designed to protect its position in the market. For its BCT products, Streck planned to apply for broad patent protections for extended periods of time.

Streck's financial performance surged in recent years. From 2010 to 2014, Streck's annual net sales went from $73.9 million to $101.8 million, averaging 8 percent growth each year. During this time period, Streck's average gross profit margins were 62.6 percent, 64.4 percent, 66.7 percent, 68.6 percent, and 69.7 percent. Streck's adjusted earnings before interest, taxes, depreciation, and amortization (EBITDA) during this period was $33.7 million, $36.1 million, $40.1 million, $49.6 million, and $53.6 million. In April 2014, Streck had 10 new products in development. In July 2014, Streck set a goal to double sales within the next 6 years and set a goal for 2015 to develop and execute a growth strategy to achieve $200 million in sales by 2020. Streck expected continued growth with its BCT products and planned to gain one of the largest companies in Streck's industry as a new client.

### (b) Ryan Family

Dr. Ryan was Streck's founder, director of research and development, CEO, and chairman of the board. Dr. Ryan and his wife, Eileen Ryan, had five children: Constance Ryan (Connie), Tim Ryan, Stacy Ryan, Carol Ryan, and Steven Ryan. The ownership structure of Streck is comprised of the Wayne L. Ryan Revocable Trust (the RRT), which owns 52.275 percent; Eileen's trust, which owns 39.641 percent; and Connie's trust and the 2014 "Grantor Retained Annuity Trust," which

owns 8.008 percent. In 2014, Dr. Ryan gifted .026 percent of Streck's voting stock to Carol, Steven, and Barry Uphoff, a family friend. Uphoff worked in Streck's laboratory after college and later served on Streck's board of directors for nearly a decade, including a brief period as chairman of the board.

In March 2013, Eileen passed away. Eileen's estate conveyed her one-third of Streck's voting shares to Connie, giving Connie two-thirds of the company's voting shares. As a result, Connie obtained voting control of Streck, with the power to appoint a majority of Streck's board of directors. In September 2013, based on her own recommendation to the board, Connie replaced her father, Dr. Ryan, as CEO. Connie proposed that Streck name a new director of research and development and encouraged Dr. Ryan to retire. Dr. Ryan did not object to Connie's becoming CEO so long as the company was sold. Connie agreed to prepare the company for sale in the next 2 to 3 years.

In the spring of 2014, Dr. Ryan made Carol the trustee of the RRT.

## 2. Project Blizzard

Connie's effort to sell Streck was referred to within Streck as "Project Blizzard." In January 2014, prior to the launch of Project Blizzard, Streck received interest from potential buyers. A private investor told Connie he would buy Streck for $330 million. Mike Morgan, Streck's former chief financial officer (CEO), valued Streck at $285 million for purposes of making an offer to purchase 10 percent of Streck. Uphoff, who is also the founder and managing partner of a private equity firm, Capricorn Healthcare & Special Opportunities (Capricorn), submitted an indication that he would purchase Streck for $425 million.

During this time, Dr. Ryan engaged Carson Wealth Management Group (Carson) to conduct a valuation. Carson found Streck to be a "very high quality business with incredible margins and solid growth prospects." Two analysts from Carson independently valued Streck at approximately $705 million.

According to the testimony of Carol, based on the interest from prospective buyers in the early part of 2014, Connie and Streck's chairman of the board, Ron Gartlan, believed they could conduct a sales process themselves and bring in an investment banker at the end of the sales process. Connie and Gartlan determined that the sale of Streck would be run through Streck's management, without input from Dr. Ryan and Carol. Dr. Ryan and Carol voiced that Streck was going blind into the sale as to its true value, and they expressed concern about the lack of the involvement of an investment banker. Gartlan indicated that he was familiar with an investment banker that Streck could use, and in March 2014, Streck engaged the investment banker without interviewing other candidates. Thereafter, Dr. Ryan and Carol were excluded from the meetings which Streck and its investment banker had with potential buyers.

Project Blizzard consisted of three rounds of bidding. In the first two rounds, each prospective buyer submitted a preliminary indication of interest (IOI). In the third round, each buyer submitted a final letter of intent (LOI). The bids excluded the approximately $76.5 million of cash held by Streck, which would be distributed to the shareholders prior to closing. All of the bids submitted through the process agreed to Streck's primary terms, which were to keep the business in Omaha, Nebraska; maintain relationships with key customers; and retain key employees, including Connie and her management team.

Ten potential buyers, consisting of one diagnostics health care company and nine private equity companies, submitted an IOI in the first round. Most bids contained a range with a low number and high number. The bids were as follows: Bio-Techne, Inc., $387 million to $427 million; Water Street, $415 million to $430 million; Summit Partners, $425 million; Capricorn, $425 million to $450 million; Bain Capital Partners, LLC, $475 million to $525 million; The Carlyle Group, $550 million to $600 million; The Jordan Company,

$550 million to $600 million; Genstar Capital Management LLC, $570 million; GTCR, $575 million to $625 million; and Warburg Pincus LLC, $525 million to $625 million. GTCR, a private equity firm based in Chicago, Illinois, launched a new fund in 2014 and was searching for a platform company in molecular diagnostics. GTCR submitted a bid with a midpoint of $600 million, which was the highest in the first round.

Connie, with support from the board and Streck's investment banker, selected 6 of the 10 potential buyers to visit Streck to meet with management, tour the facilities, and obtain further due diligence from Streck. The four lowest bids from round one advanced to round two. GTCR, the highest bidder, did not advance to round two. Each potential buyer selected for round two submitted a revised IOI. The round two bids were as follows: Summit Partners, $350 million to $375 million; Bio-Techne, $432 million to $447 million; Capricorn, $490 million to $515 million; Water Street, $505 million to $530 million; The Carlyle Group, $565 million to $585 million; and Warburg Pincus, $575 million. Also around this time period, in June 2014, Streck's investment banker valued Streck at $558.5 million, exclusive of cash.

At a board meeting held July 11, 2014, Dr. Ryan announced that he had lost confidence in the sales process. Dr. Ryan, a 52.275 percent shareholder and the income beneficiary of Eileen's trust, stated that he had requested to include Carol and the trustee of Eileen's trust in the process and that it was unfair to exclude them. Before leaving the meeting, Dr. Ryan stated:

> I own now 92% of the stock. Connie owns eight. And the Board has zero. You have nothing to lose. I have everything to lose in this decision you're making. . . . The decisions about the bidding process and the bidders are being made without input from approximately 92% of the total votes.

Streck went through the offers, submitted followup questions, and selected the companies which made the four

highest bids as finalists and requested that each submit an LOI. Streck's investment banker maintained a dialogue with the potential buyers and facilitated further due diligence. Streck's management conducted a second round of meetings with the buyers. Following this process, Capricorn elected not to submit an LOI.

Streck received three LOI's in the third and final round. Warburg Pincus offered $450 million, plus a $50 million 3-year earnout. Water Street offered $530 million. The Carlyle Group offered $590 million. On August 19, 2014, the board held a meeting to select an LOI to recommend to the shareholders. Dr. Ryan announced that he did not find any of the LOI's to be acceptable. Dr. Ryan stated that he was in no position to approve a sale, because he did not see what was gained. Dr. Ryan expressed that he was not being listened to and that the process was a waste of time. After Dr. Ryan exited the meeting, the board adopted a resolution to discontinue the sales process for at least 2 years before exploring another potential sale. Connie stated that she was no longer interested in selling the company and that due to her majority voting rights, there would be no sale without her agreement.

Following the August 2014 board of directors' meeting, Uphoff submitted an IOI to Dr. Ryan that valued Streck at $420 million. In September 2014, Carol, as trustee for the RRT, and with approval from the trustee of Eileen's trust, contacted GTCR. GTCR submitted an IOI of $625 million to $675 million. Connie refused Carol's request to schedule a shareholders' meeting to consider GTCR's proposal. Connie stated that she had "informed the Board that I do not wish to pursue a sale" and that Streck had terminated its engagement with its investment banker. Carol convened a shareholders' meeting to discuss GTCR's offer, which Connie did not attend.

### 3. Pretrial

In October 2014, the RRT filed suit against Connie and Streck in the district court for Sarpy County, alleging shareholder oppression under Neb. Rev. Stat. § 21-20,162 (Reissue

2012) and breach of fiduciary duty. The petition requested, among other things, judicial dissolution of Streck.

Streck formed a "Special Litigation Committee" (SLC) to determine how to respond to the lawsuit. Streck engaged a financial advisor, Empire Valuation Consultants, LLC (Empire), to conduct an independent valuation of Streck. Empire valued the RRT's shares at a range of approximately $271 million to $328 million. After investigating the matter and considering various alternatives, the SLC found that a sale of Streck "continues to be an attractive alternative" if the shareholders committed to a sale at a reasonable price. However, the SLC was not confident that the shareholders would agree to a sale despite the advantages. Therefore, the SLC recommended that Streck purchase the RRT's stock. In making this recommendation, the SLC recognized the litigation risk to Streck, including the potential for an extended legal process and a high stock value established by the court. But the SLC concluded that these "obligations and risks are outweighed by the benefits realized."

On January 19, 2015, Streck filed an "Election to Purchase" the RRT's shares pursuant to Neb. Rev. Stat. § 21-20,166 (Reissue 2012). Prior to the repeal of § 21-20,166, made effective January 1, 2017, by 2015 Neb. Laws, L.B. 157, § 10, it allowed a corporation in a judicial dissolution action to, rather than dissolve, elect to purchase the shares owned by the petitioning shareholder. Since the time that Streck filed the election to purchase, and prior to this appeal, the Legislature repealed § 21-20,166 due to the adoption of the Nebraska Model Business Corporation Act (NMBCA), Neb. Rev. Stat. §§ 21-201 through 21-2,232 (Cum. Supp. 2016). However, § 21-2,232 of the NMBCA contains a saving provision that provides that the repeal of any statute by the NMBCA "does not affect" any "dissolution commenced under the statute before its repeal, and the . . . dissolution may be completed in accordance with the statute as if it had not been repealed." Furthermore, based on the timing of events in this matter,

the provisions of § 21-20,166 are applicable.[1] In any event, the election provisions under the now-repealed § 21-20,166 are substantially similar to those found in the NMBCA. Thus, the repeal of § 21-20,166 is not material in this matter.

Under § 21-20,166(3), parties have 60 days from the filing of the election to reach an agreement on the fair value and terms of purchase of the petitioner's shares. When an agreement is not reached, under § 21-20,166(4), the court, "upon application of any party, shall stay such proceedings and determine the fair value of the petitioner's shares as of the day before the date on which the petition [for dissolution] was filed or as of such other date as the court deems appropriate under the circumstances."

In February 2015, Streck offered to purchase the RRT's shares for approximately $220 million, which included an $80 million discount for lack of control and lack of marketability. On March 23, 2015, Streck filed an application for stay, alleging that 60 days had elapsed and that the parties could not agree on the value of the RRT's shares. Streck asked the court to determine the fair value of the RRT's shares as of October 29, 2014, the day before the filing of the RRT's petition. Connie filed a motion also requesting that the court grant a stay and determine the fair value of the RRT's shares. Connie did not file her own election to purchase the RRT's shares. On April 28, 2015, the court issued a stay and permitted an additional 90 days for discovery and negotiations on the issue of fair value.

On June 29, 2015, the RRT moved for leave to file an amended complaint. The RRT's proposed amended complaint requested that the court declare Streck's election to purchase the RRT's shares invalid. The court held a hearing and denied the motion to amend.

---

[1] *Dragon v. Cheesecake Factory*, 300 Neb. 548, 915 N.W.2d 418 (2018) (statutes covering substantive matters in effect at time of transaction or event govern, not later enacted statutes).

In January 2016, the RRT moved for partial summary judgment, seeking an order that discounts for lack of control or lack of marketability are not applicable in the determination of the "fair value" of the RRT's shares. Streck filed its own motion for partial summary judgment, seeking an order that under § 21-20,166(2), it validly exercised its election to purchase the RRT's shares. On April 25, the court entered an order granting both motions. With respect to the RRT's motion, the court found that, pursuant to our holding in *Rigel Corp. v. Cutchall*,[2] discounts for lack of control or lack of marketability are not applicable when determining the "fair value" of a petitioning shareholder's corporate stock. With regard to Streck's motion, the court held that Streck was entitled to exercise an election to purchase the RRT's shares, and had validly done so, and that therefore, under § 21-20,166, the election was not subject to challenge.

On May 13, 2016, Stacy, for the second time, sought to intervene in the case. The court sustained Streck's motion to strike Stacy's complaint in intervention. We affirmed the district court's denial of leave to intervene.[3] The matter returned to the district court.

## 4. Bench Trial

Dr. Ryan passed away in 2017. Thereafter, Carol stepped down as trustee. Steven and a trust company were appointed to serve as cotrustees of the RRT. The district court held a bench trial from September 24 through October 4, 2018. The principal issues before the court were (1) the fair value of the RRT's shares of Streck as of October 29, 2014; (2) whether the RRT was entitled to an interest award under § 21-20,166(5)(a); and (3) whether to allow Streck to purchase the RRT's shares in installments.

---

[2] *Rigel Corp. v. Cutchall*, 245 Neb. 118, 511 N.W.2d 519 (1994).

[3] *Wayne L. Ryan Revocable Trust v. Ryan*, 297 Neb. 761, 901 N.W.2d 671 (2017).

### (a) Valuation Experts Robert Reilly
### and Jeffrey Risius

At trial, the court heard opposing testimony from two experts in business valuation. Both experts utilized the discounted cashflow (DCF) method, a generally accepted method under the income approach. In combination with the DCF method, both experts utilized two generally accepted methods under the market approach, which were the guideline publicly traded company (GPTC) method and the guideline merger and acquisition (GMA) method.

The RRT's business valuation expert, Robert Reilly, has authored 12 textbooks on valuation issues and has testified in court over 150 times. Reilly has helped develop valuation standards for professional organizations such as The Appraisal Foundation, the American Society of Appraisers, the American Institute of Certified Public Accountants, and the National Association of Certified Valuation Analysts. Reilly opined that the fair value of the shares held by the RRT was $467 million.

Streck's valuation expert, Jeffrey Risius, is a principal in an international financial advisory firm and has been in the valuation business for almost 30 years. Risius has authored a book on valuation for the legal profession published by the business law section of the American Bar Association. Risius has extensive experience testifying as an expert witness on the issue of business valuation. Risius opined that the fair value of the shares held by the RRT was $304 million.

### (i) DCF Method

The experts described the DCF method as determining Streck's operating cashflow by evaluating financial projections and discounting Streck's anticipated earnings to its present value. The experts evaluated financial projections for three time periods: 2015 through 2019, 2020 through 2024, and 2025 into perpetuity. The experts considered several factors in calculating an appropriate discount rate. The higher the discount rate, the lower the valuation.

For the first time period, both experts used the same projections, completed by Streck's then-CFO, Morgan, in May 2014 for use in Project Blizzard. Morgan projected that, for existing products, Streck's revenues would grow to $148 million in 2019. According to the report of the SLC, Connie expressed confidence that Streck's financial projections would be achieved and indicated they are "deliberately conservative." For 2013, Streck's net income exceeded its plan by $11.5 million. From 2015 through 2017, Streck's financial performance exceeded its projections. Reilly used the "deliberately conservative" projections for 2015 through 2019 prepared by Streck, but Risius used projections that were $10 million lower.

For 2020 through 2024, Reilly projected growth rates of 8 percent, 8 percent, 7 percent, 6.5 percent, and 4.5 percent, respectively. Reilly considered Streck's historical growth rates and projections for publicly traded companies which Reilly concluded were comparable to Streck. Reilly assumed Streck's growth rate would decrease on a stairstep basis rather than "fall off a cliff." Reilly then applied a 4.5-percent growth rate from 2025 into perpetuity. Reilly admitted that his projected growth rates were downward assumptions, because Streck's profits had consistently increased. In determining a terminal growth rate of 4.5 percent, Reilly considered Streck's historic growth rate and the anticipated industry growth rate, as well as gross domestic product growth rates and inflation rates. Reilly's projected growth rate of 4.5 percent was approximately half of the industry's historic growth rates. Reilly explained that a terminal growth rate of 4.5 percent assumed that Streck will revert from a period of "supernormal growth" to growing at the rate of inflation and growth in the economy. Risius applied a 3-percent growth rate from 2020 into perpetuity, citing risks such as customer concentration, low growth in hematology, competition, and patent expirations. The experts' use of different long-term growth rates resulted in a difference in valuation of approximately $65 million.

Next, the experts calculated a discount rate, or "weighted average cost of capital." Reilly applied a discount rate of 11 percent. Reilly's discount rate was based on the averaged sum of a 2.8-percent risk-free rate of return, a 5.6-percent industry-adjusted general equity risk premium, a 2.4-percent company-size risk premium, and a .5-percent company-specific risk premium. Reilly applied a company-size risk premium of 2.4 percent, because that is the premium applied to companies in the eighth decile of the "Size Premia Study." Based upon his market analysis, Reilly placed Streck in the eighth decile, which includes companies valued between $636 million and $1.05 billion. Reilly also calculated the same discount rate of 11 percent using a buildup model. By applying his projections and discount rate under the DCF method, Reilly valued Streck at $707 million.

Risius applied a discount rate of 12.4 percent. Risius differed from Reilly in his selection of a company-size risk premium. Risius testified that because the market capitalization of Streck was not available, he could not place Streck in the eighth decile. Risius reviewed Streck's financial figures and arrived at a company-size risk premium of 6 percent. Because 6 percent appeared too high, Risius placed Streck in the "'microcap' [decile of] the Size Premia-Study," which has a premium of 3.87 percent. The microcap group includes both 9th and 10th decile companies, which have a market capitalization of between $2 million and $663 million. Finally, the experts used different company-specific risk premiums, with Risius applying 1 percent as compared to Reilly's .5 percent. Under the DCF method, Risius valued Streck at $456 million.

### (ii) GPTC Method

The GPTC method measures the amount that Streck would trade for based on a comparison of Streck to publicly traded companies of similar size or profitability in the same line of business. The measurement of value is based on the multiples of earnings of comparable publicly traded companies. For example, if a company's EBITDA is $10 million and a

buyer makes an offer of $100 million, the offer represents 10 multiples of the company's EBITDA.

Reilly performed a GPTC analysis of Streck by selecting publicly traded companies within the same standard industrial classifications (SIC) codes, codes 2835 and 3826. The U.S. Department of Labor defines SIC code 2835, entitled "In Vitro and In Vivo Diagnostic Substances," as follows:

Establishments primarily engaged in manufacturing in vitro and in vivo diagnostic substances, whether or not packaged for retail sale. These materials as chemical, biological, or radioactive substances used in diagnosing or monitoring the state of human or veterinary health by identifying and measuring normal or abnormal constituents of body fluids or tissues.

SIC code 3826, entitled "Laboratory Analytical Instruments," is defined as follows: "Establishments primarily engaged in manufacturing laboratory instruments and instrumentation systems for chemical or physical analysis of the composition or concentration of samples of solid, fluid, gaseous, or composite material."

Reilly selected six guideline companies within these SIC codes which had operations comparable to Streck. Each of the guideline companies Reilly selected were included in valuations conducted by Risius and Empire. Reilly found that Streck had been growing at a faster rate than the selected companies. To be conservative, Reilly used pricing multiples that were approximately 20 percent below the median of the selected companies. Reilly applied multiples of earnings of between 13.5 and 15 EBITDA to Streck's financial performance as of October 2014 and valued Streck under the GPTC method at $771 million.

Risius' GPTC companies had an average EBITDA multiple of 17.1. However, Risius concluded that Streck was not truly comparable to any of the GPTC companies. Risius therefore applied an EBITDA multiple of 9.5 and valued Streck under the GPTC method at $487 million.

The RRT adduced evidence that for tax purposes, separate from the valuation proceedings, Risius' firm performed a valuation of Streck as of July 2014. Risius' firm applied multiples for Streck which, if applied by Risius in this case, would increase Risius' value under the GPTC method by $172 million.

### (iii) GMA Method

Under the GMA method, both Reilly and Risius conducted a search of publicly available information regarding mergers and acquisitions of companies similar to Streck. Reilly selected 10 mergers and acquisitions involving companies in the same SIC codes as Streck, and then selected the median of the multiples of earnings reflected in those transactions. Reilly applied those multiples to Streck's financial metrics and valued Streck at $704 million. Risius found that given the uniqueness of Streck, there are few, if any, comparable sale transactions for consideration. Risius instead primarily relied upon the LOI's obtained during Project Blizzard to determine a value for Streck. Based on the median of the three LOI's, Risius arrived at a value of $545 million.

### (iv) "S Corp Premium"

Each method employed by the experts measures the value of a subchapter C corporation. Because Streck is a subchapter S corporation, the experts agreed that applying an "S Corp premium" is necessary to reflect the value of the economic benefits associated with Streck's status as an S corporation.

Both experts utilized the S corporation economic adjustment model method. Reilly, after considering other additional methods, concluded that the appropriate premium was 14 percent. Risius also concluded that the appropriate premium was 14 percent. However, due to the risk that Streck could elect to become a C corporation in the future, Risius adjusted the premium to 7.1 percent. This adjustment reduced Risius' valuation by $32 million.

### (v) Valuation Conclusions

As a final step to determine fair value, the experts added Streck's $76,495,000 in cash and marketable securities as of October 2014. Reilly valued Streck under the three methods at $717 million, applied a 14-percent S Corp premium, and added Streck's cash to conclude that the fair value of Streck was $893 million. Reilly opined that the fair value of the RRT's 52.275 percent ownership interest was $467 million.

Risius applied a 7-percent S Corp premium to only his valuation under the DCF method and then synthesized his valuations under the three methods to arrive at a value of $505 million. After adding Streck's cash, Risius valued Streck at approximately $581 million and found the rounded fair value of the shares held by the RRT to be $304 million.

### (b) John Riddle

The court heard testimony from the RRT's expert witness John Riddle, an experienced investment banker who specializes in the diagnostic health care industry. Riddle's experience includes developing and evaluating financial projections in connection with mergers and acquisitions. Riddle explained that as of October 2014, the health care life sciences market was growing at or over 7 percent. He testified that Streck was growing over the industry's trend, that Streck had a strong profile for growth as compared to the market, and that, due to its positioning, Streck had "niche market dominance." Riddle stated that "there is no other company like Streck in America certainly, and perhaps in the world." Utilizing Streck's projections, Riddle conducted a leveraged buyout analysis which valued Streck at between $646 million and $742 million before considering an S Corp premium or adding back cash.

Riddle opined that Project Blizzard was a flawed and failed process. Riddle stated that he expected to see offers "several hundred million dollars" higher than the LOI's Streck received. Riddle testified that Streck's growth projections were too conservative and were not properly characterized to the

prospective buyers during Project Blizzard. Riddle criticized Streck's choice of investment banker given the banker's lack of experience in the diagnostic health care market; Streck's decision to exclude GTCR, the highest bidder in round one; and Streck's instruction of terms in bid instruction letters, such as a reverse breakup fee and a preference to use low amounts of leverage, which Riddle contended chilled interest and drove down the price.

Streck did not rebut Riddle's testimony with any testimony of comparable expertise. Streck called investment banker James Calandra as an expert witness, but due to his lack of relevant experience, Calandra was not permitted to offer any opinions regarding Streck's value within the diagnostic health care industry.

### 5. DISTRICT COURT'S FINDINGS

On July 23, 2019, the district court issued its posttrial opinion and order. The court adopted the RRT's 74-page proposed findings verbatim, while adding the statutory definition of "[f]air value" under § 21-2,171. Thus, the court adopted the valuation and testimony of the RRT's expert witnesses Reilly and Riddle and rejected the testimony of Streck's expert witness Risius.

### (a) Fair Value

The court found that the RRT met its burden of proving the fair value of its shares. The court found that (1) Reilly's projections of Streck's revenue and income were in line with Streck's projections and prospects for growth, (2) Reilly's long-term growth rate of 4.5 percent was reasonable, (3) Reilly's selected company-size risk premium and company-specific risk premium were reasonable, (4) Reilly's selected multiples of earnings from GPTC companies were reasonable and in line with companies in Streck's industry, and (5) Reilly "credibly and convincingly testified" that no rational company would convert from an S corporation to a C corporation prior

to a sale. The court found that "Riddle credibly testified that several aspects of Project Blizzard served to limit the price offered for Streck."

The court found that Risius' "downward bias" rendered his valuation under the DCF method "inherently unreliable." The court found that Risius' explanations for his projections were "misleading and not credible." The court found that Risius "double-counted" the same risks to justify his projections and selected company-specific risk premium. The court found that Risius' explanation of his company-size risk premium was not credible. The court found Risius' valuations under the GPTC method and the GMA method reflected a downward bias. The court found that Risius' "arbitrary halving of the S Corp premium reflects his downward bias." The court found that Risius' downward bias "renders his conclusion unreliable."

The court also found that the equities of the case favored Reilly's valuation, because Dr. Ryan founded Streck and developed the technology upon which the company was built and he established Streck's relationship with its largest customer. The court stated that pursuant to *Rigel Corp.*, a fair value determination should attempt to measure what Dr. Ryan lost.[4] The court found that Dr. Ryan's loss of his interest in Streck "was substantial, and that is reflected in the fair value of his shares as determined by Reilly." The court found that Dr. Ryan was justified in not agreeing to a sale during Project Blizzard, because Dr. Ryan was shut out of the process and had warned that he was not supporting Project Blizzard. Thus, the court found that it was "not a surprise that Dr. Ryan would not approve a sale to the Project Blizzard buyers."

### (b) Prejudgment Interest

The court found that the RRT was entitled to an award of prejudgment interest pursuant to § 21-20,166(5)(a), which states in part:

---

[4] See *Rigel Corp., supra* note 2.

Interest may be allowed at the rate specified in section 45-104, [12 percent per annum,] as such rate may from time to time be adjusted by the Legislature, and from the date determined by the court to be equitable, but if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed.

The court found that, under § 21-20,166(5)(a), there was no evidence that the RRT refused an offer of payment arbitrarily or in bad faith. The court found that the RRT should be awarded prejudgment interest commencing on the date Streck filed its election to purchase, January 19, 2015, through the time of Streck's purchase. In so ruling, the court rejected Streck's arguments opposing a prejudgment interest award.

Streck argued that the award of prejudgment interest was controlled by Neb. Rev. Stat. § 45-103.2 (Reissue 2010) and that the RRT failed to satisfy the procedural requirements of § 45-103.2. Streck argued the court was precluded from awarding prejudgment interest on an unliquidated amount. The court found Streck's arguments to be without merit, because in a fair value proceeding regarding the petitioning shareholder's shares, the award of prejudgment interest is governed by § 21-20,166(5)(a), which specifically references Neb. Rev. Stat. § 45-104 (Reissue 2010), not § 45-103.2. The court found "the procedural requirements set forth in § 45-103.02, when viewed in the context of § 21-20,166, do not make sense and are clearly not applicable." The court found the amount at issue in a fair value proceeding is contested and therefore will be unliquidated. Lastly, the court found no merit to Streck's arguments that prejudgment interest should not be awarded due to the RRT's challenge of Streck's election to purchase and due to the RRT's lack of objection to Stacy's attempt to intervene in the case.

### 6. Posttrial

Following trial, the RRT moved for a final order directing Streck's purchase pursuant to § 21-20,166(5)(a), which

states that "[u]pon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate . . . ." The court held a hearing on the motion on August 12, 2019, at which Streck requested to make installment payments. On September 13, the court granted the RRT's motion and ordered Streck to pay the fair value portion of the judgment within 10 days.

The court found that Streck represented at an August 2018 hearing that it was ready to purchase the RRT's shares. The court found that Streck's SLC considered the affordability of the judgment in its January 2015 report when it recommended that Streck purchase Dr. Ryan's shares. The court found the SLC report contained assurances from Streck's CEO and then-CFO that Streck could afford the entire judgment through a combination of cash, borrowing, and, if necessary, private equity investment. The court found the evidence demonstrated that Streck had secured the ability to pay for the fair value of the RRT's shares in full as of January 2015 and that there was no credible evidence Streck could not purchase the RRT's shares. The court found it "particularly troublesome" that, if Streck's argument were accepted, Streck would not be able to afford even the valuation of its own expert. The court found that this alone demonstrated that Streck had come before it "with unclean hands." The court awarded the RRT prejudgment interest in the amount of approximately $256 million for the period of January 19, 2015, through August 12, 2019. The court dismissed the RRT's petition for dissolution.

Streck moved for a new trial. Connie moved for a new trial and moved to alter or amend. The court denied the motions. Streck filed an appeal, and we granted the parties' request for bypass.

## II. ASSIGNMENTS OF ERROR

Streck assigns, restated and summarized, that the district court erred in (1) adopting the RRT's proposed findings,

(2) valuing the RRT's shares, (3) awarding prejudgment interest, and (4) refusing Streck's request to make installment payments.

Connie filed a brief asserting assignments of error which overlap with and reiterate Streck's arguments regarding the court's valuation and order directing purchase. However, although Connie was the principal defendant in the RRT's petition and she filed a motion requesting that the court determine the fair value of the RRT's shares, Connie did not file an election to purchase any shares under § 21-2,201(d). Therefore, Connie, in her individual capacity, is not a proper party to these proceedings.[5]

## III. STANDARD OF REVIEW

[1,2] A proceeding to determine the fair value of a petitioning shareholder's shares of stock is equitable in nature.[6] An appellate court reviews an equitable action de novo on the record and reaches a conclusion independent of the factual findings of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[7]

[3] Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.[8]

[4] Awards of prejudgment interest are reviewed de novo.[9]

---

[5] See *Anderson v. A & R Ag Spraying & Trucking*, 306 Neb. 484, 946 N.W.2d 435 (2020).

[6] See, *id.*; *Rigel Corp., supra* note 2.

[7] *Id*.

[8] *Id*.

[9] *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020); *Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

## IV. ANALYSIS

### 1. Adoption of Proposed Findings

As a threshold matter, Streck argues that by adopting the RRT's posttrial proposed findings nearly verbatim, the court erred because it failed to independently review all of the relevant evidence. In response, the RRT argues that where one party's submission credibly establishes the merits of the case, and the other party's does not, the court may adopt the credible submission.

[5-8] A trial court in a case tried to the court without a jury may adopt a party's proposed findings of fact verbatim provided that the findings and conclusions reflect the court's independent view and judgment of the evidence.[10] Although findings drawn by the trial court itself are more helpful to the appellate court, findings prepared by counsel and adopted verbatim by the trial judge are formally the judge's and will stand if supported by evidence.[11] The adoption of a party's proposed findings does not require an appellate court to set aside the deference ordinarily given to the trial judge's factual findings.[12] When accepting a party's proposed findings, minor mistakes that do not prejudice a party constitute harmless error; however, a trial court may commit error if the proposed facts or law are unsupported by the evidence and cause prejudice.[13] The critical inquiry is whether such findings, as adopted by the court, are clearly erroneous.[14]

---

[10] 89 C.J.S. *Trial* § 1261 (2012).

[11] See *United States v. El Paso Gas Co.*, 376 U.S. 651, 84 S. Ct. 1044, 12 L. Ed. 2d 12 (1964); 75B Am. Jur. 2d *Trial* § 1596 (2018). See, also, *In re Estate of Lane*, 39 Kan. App. 2d 1062, 188 P.3d 23 (2008).

[12] See, *In re Estate of Lane, supra* note 11; *Indiana Industries, Inc. v. Wedge Products*, 430 N.E.2d 419 (Ind. App. 1982).

[13] *In re H.M.*, 2014 Ohio 755, 9 N.E.3d 470 (2014). See *In re M.B.*, 709 N.W.2d 11 (N.D. 2006).

[14] See, *In re M.B., supra* note 13; *Bluford v. Wells Fargo Fin. Ohio 1, Inc.*, 176 Ohio App. 3d 500, 892 N.E.2d 920 (2008).

In one of the leading state court cases on this issue, *Uptime Corp. v Colorado Research Corp.*,[15] the Supreme Court of Colorado held that when a trial judge signs findings prepared by counsel for the prevailing party, the correctness of the findings becomes the judge's responsibility, and the appellate court will presume that the trial judge examined the proposed findings and agreed that they correctly stated the facts as the judge found them to be. Moreover, independent of any presumption, appellate courts have remarked that when a trial court makes changes to the proposed findings, that is an indication the trial court considered the findings before adopting them and read, analyzed, and agreed with the findings that were left unchanged.[16]

Here, we find no merit to Streck's assertion that the court did not exercise independent judgment as the finder of fact. The record demonstrates that the court carefully considered the issues and provided thorough reasons for its decision. Although Streck identifies certain isolated findings which it claims are not correct, a court errs in adopting a party's proposed findings only if the findings are unsupported by the evidence and cause prejudice.[17] Streck's assignment of error here fails because, even if Streck has identified mistakes in the court's findings, when the trial record regarding valuation is considered as a whole, Streck has failed to demonstrate that it suffered any prejudice as a result of any erroneous findings.

Streck claims the court should not have referenced Riddle's testimony that at the time of trial, Streck was valued at over $1 billion. Streck is correct that the relevant valuation date is October 29, 2014, and not the 2018 trial date. However, the court's findings made this clear by stating that "the Court fixed the valuation date as October 29, 2014." The court

---

[15] *Uptime Corp. v. Colorado Research Corp.*, 161 Colo. 87, 420 P.2d 232 (1966).

[16] See, *Harris v. AHTNA, Inc.*, 193 P.3d 300 (Alaska 2008); *Stevens v. Humana of Delaware, Inc.*, 832 P.2d 1076 (Colo. App. 1992).

[17] See *In re H.M., supra* note 13.

was merely referencing the RRT's argument for a different valuation date.

Streck claims the court erred by referencing the valuation conducted by Carson. In its posttrial findings, the court listed the Carson valuation as an indication of value obtained prior to the commencement of Project Blizzard. We agree with Streck that in this isolated finding, the court misstated the amount of the Carson valuation. Based on our review of the evidence, Carson valued Streck at $705 million rather than $850 million as stated by the court. However, we find the court's error to be harmless, because it is undisputed that the court received Carson's valuation for the limited purpose of showing Carol's state of mind early in the sales process. Additionally, the record indicates that the court considered the Carson valuation for the sole and limited purpose of an indication of value which Carol became aware of in early 2014. Therefore, even if Streck has identified a mistake in the court's adopted findings, there is no evidence that this particular finding played a material role in the court's valuation analysis such that Streck suffered any unfair prejudice.

Additionally, Streck assigns that the court erred by denying its request to include the RRT's posttrial proposed findings in the record for purposes of appeal. While the court did not receive the RRT's findings as substantive evidence for purposes of considering Streck's motion for a new trial, Streck did mark the RRT's proposed findings as an exhibit and that exhibit does appear in our record on appeal. This assignment of error is without merit.

## 2. Fair Value of the RRT's Shares

Streck argues that the court erred in determining the fair value of the RRT's shares to be $467 million. All of Streck's arguments on the issue of fair value are based upon the testimony of Risius or the Project Blizzard LOI's, which Streck argues are the best indicia of value in the record. Streck argues that the court erred in adopting Reilly's valuation, because Reilly improperly assumed synergies; Reilly did not

consider the Project Blizzard LOI's; and at one point in his testimony, Reilly discussed fair market value rather than fair value. Streck claims that it has identified errors in Reilly's calculations, as adopted by the court, with respect to each valuation method and the application of the S Corp premium.

[9,10] This court has previously stated that in determining the fair value of a petitioning shareholder's stock, the "'real objective is to ascertain the actual worth of that which the [shareholder] loses.'"[18] Such a determination is to be based on all material factors and elements that affect value, given to each the weight indicated by the circumstances.[19] Under this analysis, the court may consider the nature of the business and its operations, its assets and liabilities, its earning capacity, the investment value of its stock, the market value of the stock, the price of stocks of like character, the size of the surplus, the amount and regularity of dividends, future prospects of the industry and of the company, and good will, if any.[20]

[11-13] The determination of the weight that should be given expert testimony is uniquely the province of the fact finder.[21] The trial court is not required to accept any one method of stock valuation as more accurate than another accounting procedure.[22] A trial court's valuation of a closely held corporation is reasonable if it has an acceptable basis in fact and principle.[23]

---

[18] *Rigel Corp., supra* note 2, 245 Neb. at 127, 511 N.W.2d at 524 (quoting *Warren v. Balto. Transit Co.*, 220 Md. 478, 154 A.2d 796 (1959)). See *Anderson, supra* note 5.

[19] See, *id*. See, also, *Athlon Sports Communications v. Duggan*, 549 S.W.3d 107 (Tenn. 2018); *Belk of Spartanburg, S.C. v. Thompson*, 337 S.C. 109, 522 S.E.2d 357 (S.C. App. 1999); *Walter S. Cheesman Realty Co. v. Moore*, 770 P.2d 1308 (Colo. App. 1988).

[20] See *id*.

[21] *Anderson, supra* note 5; *Fredericks Peebles v. Assam*, 300 Neb. 670, 915 N.W.2d 770 (2018).

[22] *Anderson, supra* note 5.

[23] *Id*.

[14-16] A judicial valuation of corporate stock presents unique challenges which are "complicated by 'the clash of contrary, and often antagonistic, expert opinions of value,' prompting the trial court to wade through 'widely divergent views reflecting partisan positions' in arriving at its determination of a single number for fair value."[24] While discharging its statutory mandate to value a shareholder's stock, it is entirely proper for a trial court to adopt one expert's model, methodology, and calculations if they are supported by credible evidence and the judge analyzes them critically on the record.[25] As long as they are supported by the record, an appellate court may defer to the trial court's factual findings in a statutory corporate stock valuation proceeding, even if the appellate court might independently reach a different conclusion.[26]

Upon our de novo review of the record and considering Streck's arguments on appeal, we conclude that the trial court's valuation is reasonable and has an acceptable basis in fact and principle. We conclude the court did not err in finding Reilly's valuation testimony to be reasonable and credible, in finding that Risius' testimony was not credible or reliable, and in giving weight to Riddle's unrefuted testimony that the Project Blizzard LOI's were not a reliable indication of Streck's value.

In our valuation analysis, we discuss the experts' valuations, the court's credibility findings, and the expert and lay testimony regarding the dysfunctional nature of Project Blizzard.

### (a) Reilly and Risius

Reilly and Risius used the same valuation methods and approaches. Both experts found it appropriate to perform the DCF method, the GPTC method, and the GMA method and to apply an S Corp premium and add back Streck's cash. The

---

[24] *Dell v. Magnetar Global Master Fund*, 177 A.3d 1, 22 (Del. 2017), quoting *Matter of Shell Oil Co.*, 607 A.2d 1213 (Del. 1992).

[25] *Golden Telecom, Inc. v. Global GT LP*, 11 A.3d 214 (Del. 2010).

[26] *Id.*

experts disagreed in their selection of data. A comparison of the experts' financial projections under the DCF method demonstrates the nature and extent of the experts' disagreements.

Reilly used Streck's projections for 2015 through 2019, which showed approximately 10 percent growth each year. Reilly observed that in actual performance during this period, Streck's revenue grew approximately 15 percent each year. Noting Connie's statement that Streck's projections were "deliberately conservative," Reilly stated that Streck is "a lot more profitable than the projections indicate." During trial, the court specifically noted that "it's been established through the evidence that the projections that this company has made historically up to the valuation date were extremely conservative." Conversely, Risius used short-term projections that were $10 million lower than Streck's projections.

Regarding the experts' selected long-term projections, Reilly opined that Streck's growth rate would gradually decline over 5 years until it reached 4.5 percent. Reilly's projections were similar to those used by Empire in its valuation for the SLC. Reilly explained that this figure was less than half of Streck's historic growth rate and less than half of the industry's growth rate. Reilly stated that by using lower projections, he accounted for risks such as competition and patent expirations.

Risius selected a long-term growth rate of 3 percent. Part of Risius' reasoning for using lower projections was to account for risks such as customer concentration, new competition, patent expirations, and Streck's already dominant position in the hematology market.

[17] Streck claims that the court erred by crediting Reilly's projections, because Reilly improperly assumed that Streck would overcome risks due to synergies created by the transaction. The valuation of corporate shares is to be made without consideration of any increase in value resulting from the transaction itself.[27] We disagree with Streck's characterization

---

[27] See, *Dell, supra* note 24; *Union Illinois v. Union Financial Group*, 847 A.2d 340 (Del. Ch. 2004).

of Reilly's testimony and the trial court's findings. The court did not factor synergies into its valuation, and further, there is no evidence that Reilly considered synergies in his testimony. The court merely found that Risius did not credibly value risks and that his projections were "misleading." Reilly's projections accounted for risks by using growth rates lower than the historic rates of Streck and Streck's industry. Moreover, contrary to Streck's argument that Reilly assumed synergies, there is evidence that Reilly was conservative in his valuation. Reilly based his first 5 years of his DCF analysis, and portions of his GPTC analysis, on Streck's "deliberately conservative" projections. Additionally, Streck's projections did not include anticipated growth from BCT sales. There is no merit to Streck's claim that the court increased its valuation based on synergies.

Streck argues that Reilly's valuation is an outlier and that according to the Supreme Court of Delaware's decision in *Dell v. Magnetar Global Master Fund*,[28] the district court erred by not giving greater weight to the Project Blizzard LOI's. Streck argues that the court should have given greater weight to the post-Project Blizzard IOI's as well.

In *Dell*, after a company's board approved a merger, stockholders demanded a court-conducted appraisal. The court found that the evidence regarding the sales process failed to establish a reliable indication of fair value, because the investors myopically accepted a low offer due to their focus on short-term profits. The court stated that it could not quantify how the process affected the price, and therefore, it gave the transaction price no weight when determining fair value and rendered a valuation exclusively based on its own DCF analysis. While recognizing that an appraisal is "'by design, a flexible process,'"[29] and that there is no presumption in favor of the deal price,[30] the appellate court reversed, finding

---

[28] *Dell, supra* note 24.

[29] *Id*. at 24, quoting *Golden Telecom, Inc., supra* note 25.

[30] See *Dell, supra* note 24.

that the trial court's reasoning was not grounded in the record. The appellate court found that the record showed the market analysts in the merger process understood the company's long-term outlook and that based on the evidence, the transaction price was entitled to heavy, if not overriding, weight in establishing fair value. The appellate court endorsed the efficient market hypothesis, which "teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."[31] The court noted, however, in the scenario in which there is reason to suspect that market forces cannot be relied upon, a DCF analysis provides the court with helpful data about the price a sales process would have produced.[32]

The circumstances in *Dell* are much different than those in the present case. As Streck acknowledges, rather than affording the LOI's no weight, the court here found that the LOI's created a floor for its valuation analysis. The record shows the court considered the highest LOI, submitted by The Carlyle Group, in the amount of $590 million. This LOI, after applying an S Corp premium and adding Streck's cash, represented a value of $749 million. The record further shows that the court similarly considered and weighed the post-Project Blizzard IOI submitted by GTCR. This IOI, taking the high number in the range, $675 million, and applying an S Corp premium and adding Streck's cash, represented a value of $846 million. Thus, while Reilly's valuation of Streck at $893 million is higher, Reilly's valuation is not as much of an outlier as Streck argues. Reilly measured Streck's value using reasonable GPTC companies, also selected by Risius and Empire. Reilly's valuation reflects Streck's status as a market leader and innovator with tremendous prospects for

---

[31] *Id*. at 24.

[32] See, *Dell, supra* note 24; *M.P.M. Enterprises, Inc. v. Gilbert*, 731 A.2d 790 (Del. 1999).

continued financial growth. By contrast, Risius used multiples that were inconsistent with a recent valuation of Streck conducted by Risius' firm, which reduced Risius' valuation under the GPTC method by $172 million. The court considered and weighed Reilly's valuation, Risius' valuation, and the Project Blizzard LOI's. Streck has failed to prove that the court erred in not affording greater weight to the Project Blizzard LOI's. Streck's reliance on *Dell* is misplaced.

Additionally, as Reilly explained regarding the Project Blizzard LOI's, "[t]here were no completed transactions, nor [was] there anything, in my opinion, close to completed transactions for which I could actually extract pricing evidence." Streck planned to wait to begin the process of drafting a stock purchase agreement until after it received an acceptable LOI. Had a Project Blizzard LOI been accepted, there was confirmatory diligence and closing yet to be completed. More important though, there is extensive evidence in the record that Project Blizzard was defective and did not reliably reflect the market's view regarding Streck's value.

As illustrated below through witness testimony, the sales process was flawed due to the use of tempered financials and restricting the majority shareholder's information and participation. Among the reasons for Project Blizzard's failure, Reilly noted in his report that Project Blizzard "may have been halfheartedly undertaken by Streck" and that Streck's engagement of an investment banker may have been "just a charade." Not even Risius credited the LOI's with the value Streck contends they should have. Streck has failed to show that the LOI's deserve greater consideration.

Streck also claims that Reilly failed to testify as to fair value, because at one point he referenced the standard for fair market value. The record is clear that the court's valuation did not rely upon this fleeting testimony. Streck's argument is without merit.

Streck further claims that Reilly's testimony contains several identifiable errors. As previously mentioned, in addition to their disagreement regarding Streck's financial projections,

the experts disagreed on their calculation of a discount rate under the DCF method, their valuations under the GPTC method and the GMA method, and their application of an S Corp premium.

Regarding the DCF method, Streck argued that the court erred by adopting Reilly's 4.5 percent terminal growth rate instead of Risius' 3 percent and by adopting Reilly's 2.36 percent company-size risk premium instead of Risius' 3.87 percent. Streck argued that Reilly's GPTC analysis was flawed because of Reilly's use of higher multiples; selection of companies significantly larger than Streck; and giving equal weight to the GPTC method and the DCF and GMA methods, when there are no companies which are truly comparable to Streck. Streck argued that Reilly's GMA analysis ignored the LOI's and that Reilly's application of the full 14 percent S Corp premiums ignored risks specific to Streck.

The court considered each area of disagreement between the valuation experts and found Reilly's valuation to be reasonable and supported by the evidence. The court found that each part of Risius' analysis in his valuation, including his projections and calculation of a discount rate under the DCF method, his GPTC and GMA methods, and his "arbitrary halving of the S Corp premium," reflected a downward bias which rendered his conclusions unreliable. Here, we find the expert testimony raised evidence in conflict on material issues of fact regarding the valuation of Streck's stock. Where credible evidence is in conflict on material issues of fact, the reviewing court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another.[33] Therefore, although Streck devoted much of its brief to identifying errors in Reilly's testimony, Streck's arguments lack merit because they are based on Risius' testimony, and the court made detailed findings that Risius' testimony lacked credibility. Upon de novo review, giving weight to

---

[33] See *Anderson, supra* note 5; *Assam, supra* note 21.

the trial court's judgment as to credibility, we find that the record supports the district court's findings regarding valuation. Again, we are not persuaded by Streck's reassertion of Risius' discredited testimony.

Having discussed the testimony of Risius, Streck's only remaining source of evidence regarding valuation is the Project Blizzard LOI's. We discuss the unrefuted testimony of the RRT's expert Riddle and lay witness testimony to demonstrate that the Project Blizzard LOI's are not reliable indications of fair value.

### (b) Riddle

Riddle, an investment banker who specializes in the diagnostic health care industry, evaluated Streck's projections and the Project Blizzard sales process. Riddle opined that Streck's growth was described too conservatively to buyers and that the sales process was flawed and yielded a flawed result. Apart from stating the obvious that Project Blizzard did not result in a successful sale, Riddle criticized Project Blizzard in the following areas: (i) Streck's partnership with its investment banker, (ii) Streck's decision to exclude GTCR, and (iii) Streck's depression of value through bid instruction terms. The court found that Riddle credibly testified that several aspects of Project Blizzard limited the price offered for Streck.

### (i) Streck's Partnership With Investment Banker

Streck's investment banker contacted 14 prospective buyers for Project Blizzard. Ten buyers submitted IOI's. Streck and its investment banker met with six buyers, all of which submitted second round IOI's. The third round yielded three LOI's. There is evidence that Connie and Dr. Ryan both thought the process was not run well and lacked confidence in the result. At a June 2014 board of directors' meeting, Connie addressed the board regarding the performance of Streck's investment banker as an advisor and partner. Connie announced that the investment banker's managing director is a "very poor

communicator." She stated that the investment banker has not been a partner in the sales process and has not provided reasons why Streck should choose one buyer over another. Connie stated that she did not find the investment banker to be helpful or knowledgeable within Streck's industry, even though it claimed to be an expert in health care. Connie stated, regarding the investment banker, that "as an advisor, I feel we have been left completely on our own." While acknowledging Connie's concerns, Gartlan stated that the board was "too far into it to do anything different." The board then ratified the investment banker's engagement letter. In doing so, the board discussed and considered the possible outcome that Streck would not be sold, and it confirmed that if a sale did not occur, Streck would owe the investment banker a fee of $200,000, plus commission rights up to 1 year from termination.

Based on this evidence, Riddle opined that the statements of Streck's founder and CEO showed that Streck was disappointed with its investment banker and the strength of the sales process. Riddle stated that therefore, "it was almost predictable that [Project Blizzard] did not yield the kind of results necessary to get to and the kind of value necessary to get to a transaction."

Riddle opined that the termination of Project Blizzard did not have to end the sales process. As an investment banker, Riddle stated that Streck did not get a fair assessment of the market and could do better if exposed to more buyers.

### (ii) GTCR

Of the Project Blizzard buyers, Riddle viewed GTCR as the company which offered the best price and was in the best position to succeed with Streck. In 2014, immediately prior to Project Blizzard, GTCR launched a new 10-year fund of nearly $4 billion and was looking to invest in a platform company. Riddle stated that the long investment window fit well with Streck's needs as a closely held family company, because there would be less pressure to sell with the opportunity to grow the investment over time. Riddle stated that, at

minimum, as the highest bidder in round one with an IOI of $575 million to $625 million, GTCR should have advanced in the process if only to drive up the other bids. The record shows that the midpoint of GTCR's bid in round one was $600 million and that after Project Blizzard, GTCR increased its offer to $625 million to $675 million. The exclusion of GTCR from Project Blizzard reveals the arbitrary nature of the decision-making process.

### (iii) Bid Instruction Terms

Riddle opined that the inclusion of a reverse breakup fee and a preference for low leverage in Project Blizzard bid instructions chilled interest and repressed price. According to the testimony of Riddle, as well as Uphoff, a breakup fee is money damages one party pays to another in the event the transaction is not completed. A reverse breakup fee places responsibility for money damages with the prospective buyer. Each of the final LOI's included reverse breakup fees of $20 million to $30 million. Riddle testified that based on his experience, such a fee is not customary in this type of sales process. Riddle did not focus on the amount of the fee, but stated that the fact that the fee was included at all chilled interest and depressed value, because it increased financial risk to the prospective buyers. Riddle stated that in this case, the prospective buyers still had substantial due diligence to be completed, and that such unknowns can cause buyers to bid conservatively.

Riddle testified that Streck further created a chilling effect by requesting bids which limited leverage to four times EBITDA. The final LOI's agreed to limit leverage to five times EBITDA. Riddle testified that, in and of itself, a preference for less leverage is not necessarily a problem, but it does send a message to prospective buyers that financing will be constrained and that bids using higher amounts of leverage will not be well received. Both Streck's then-CFO, Morgan, and Streck's investment banker acknowledged that a higher amount of leverage correlates with a higher bidding price. Based on his experience, Riddle opined that a company with the level

of Streck's profitability can take on and support a tremendous amount of debt.

The district court found that Riddle credibly testified that several aspects of the sales process limited the price offered for Streck. Streck has not refuted Riddle's testimony with a witness of comparable experience and expertise. Therefore, we conclude that the court did not err in giving weight to Riddle's testimony and in giving limited weight to the LOI's.

Additionally, Streck in effect considered only financial buyers. Project Blizzard included only one strategic buyer in the diagnostic health care industry. No strategic buyers advanced beyond the second round. In his report, Reilly raised the point that there are active strategic buyers which could have acquired Streck. Reilly provided an example transaction from 2016 in which a strategic buyer acquired one of the GPTC companies for $1.11 billion. The acquired company's 2015 EBITDA was $44.5 million, as compared to Streck's $63.8 million. The record indicates the preferences of management affected Streck's value in the sales process.

(c) Lay Witness Testimony

Lay witnesses produced evidence indicating that the prospects for a successful sale of Streck were bleak and that the sales process was run in an adversarial manner. Carol testified that once Connie became CEO, Dr. Ryan began to receive incomplete financial information and then stopped receiving any of Streck's financial information. Additionally, Carol testified that throughout Project Blizzard, she and Dr. Ryan were prohibited from attending sales meetings with prospective buyers. Carol explained she needed the information Streck was providing to the buyers. Carol testified, "I don't know what Streck is saying, what they're offering. All I see is numbers going down." In response to Carol and Dr. Ryan's request to receive Streck's financials, Connie and Gartlan stated that Carol and Dr. Ryan would receive only the information provided under Nebraska law.

Uphoff, a long-time friend of the Ryan family, served on Streck's board and then resigned from the board once he decided to participate in Project Blizzard as a prospective buyer. Uphoff's firm Capricorn advanced through rounds one and two, but decided not to submit an LOI. Uphoff described his experience in meeting with Streck's management regarding his first IOI. Uphoff found it odd that Dr. Ryan, the company's founder, scientist, and largest owner, was not present at the meeting. Uphoff stated that typically the seller will want to highlight that person. Noting Streck's tempered financials, Uphoff stated that overall there was not a lot of enthusiasm in Streck's presentation. Uphoff admitted this may have in part been due to the deterioration of his relationship with Connie after she became CEO.

Prior to Uphoff's meeting with Streck's management, Streck sent written questions to Uphoff, which Uphoff stated were atypical, not relevant to a potential sale, and "certainly insulting." One of Streck's questions stated:

> Barry Uphoff appears to continue to have ongoing communications with Carol Ryan, Wayne Ryan and Steven Ryan. Please document all communication that has occurred with any Ryan family member or Streck employee since you submitted your offer letter. Please provide copies of all emails sent to or from Barry Uphoff and any Ryan family member or Streck employee since Jan[.] 13, 2014. Please disclose any information related to other offers for Streck shared with Barry Uphoff by Carol, Steve or Wayne Ryan at the Creighton basketball game they attended together on Jan[.] 17, 2014. Please provide a summary of any phone calls exchanged between Barry Uphoff and Dr. Ryan since Jan[.] 13, 2014.

There is evidence that Streck's advancement of Capricorn through the sales process may have been a pretense. Morgan did not think Capricorn should advance to round two. Connie agreed that "[Uphoff] will never be on our list" but stated that "how best to manage is the question." Connie advanced Capricorn to round two in order to not "have a big moment

now." Morgan speculated that Connie kept Uphoff in the process in order to keep Dr. Ryan engaged. If Capricorn was not a good fit from Streck's perspective, then the sales process could have benefited from including GTCR in round two rather than Capricorn.

From Uphoff's perspective as a potential buyer, he stated Streck's preference for less debt was atypical. As an analogy, Uphoff stated, "if you're selling a house, you really don't care where that money comes from, whether it's out of someone's bank account or the bank they're borrowing it from, you just want that total dollar amount." Uphoff found the reverse breakup fee to be atypical. In explaining why he chose not to submit an LOI, he stated that it was "death by a thousand cuts." Uphoff stated that if everything was added up, a potential buyer would begin to wonder whether Streck was "really serious about transacting. . . . [I]s this just a waste of time trying to get something done?" In this way, Uphoff's testimony echoed much of the substance of Riddle's testimony.

We conclude that as a result of the dysfunctional nature of Project Blizzard, evidence of which was established by witness testimony, the LOI's are not entitled to significant weight in valuing Streck, and we further conclude that the trial court did not err in determining the LOI's represented a floor as to valuation.

### 3. Prejudgment Interest

The court awarded the RRT prejudgment interest pursuant to § 21-20,166(5)(a), which states: "Interest may be allowed at the rate specified in section 45-104, . . . but if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed." In doing so, the court found no evidence that the RRT refused an offer of payment arbitrarily or not in good faith. The court determined the RRT was entitled to interest on the fair value of its shares from January 19, 2015, the date of Streck's election to purchase, through August 12, 2019. The court applied the statutory interest rate

of 12 percent per annum set out in § 45-104 and awarded interest in the amount of approximately $256 million.

Streck argues that the court erred in awarding prejudgment interest, because the RRT did not comply with the requirements of § 45-103.02(1). Section 45-103.02(1) provides:

> Except as provided in section 45-103.04, interest as provided in section 45-103 shall accrue on the unpaid balance of unliquidated claims from the date of the plaintiff's first offer of settlement which is exceeded by the judgment until the entry of judgment if all of the following conditions are met:
>
> (a) The offer is made in writing upon the defendant by certified mail, return receipt requested, to allow judgment to be taken in accordance with the terms and conditions stated in the offer;
>
> (b) The offer is made not less than ten days prior to the commencement of the trial;
>
> (c) A copy of the offer and proof of delivery to the defendant in the form of a receipt signed by the party or his or her attorney is filed with the clerk of the court in which the action is pending; and
>
> (d) The offer is not accepted prior to trial or within thirty days of the date of the offer, whichever occurs first.

[18] Streck contends that the RRT is not entitled to prejudgment interest, because the claim was unliquidated, the RRT did not make a demand prior to trial, and the RRT did not plead a request for prejudgment interest. Though Streck is correct that the requirements of § 45-103.02 have not been met, we disagree with Streck that an award of prejudgment interest in this case is controlled by § 45-103.02(1). Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous.[34]

---

[34] *In re Application No. OP-0003*, 303 Neb. 872, 932 N.W.2d 653 (2019).

Section 21-20,166(5)(a) is an independent statute authorizing the recovery of prejudgment interest. The sequence contemplated by the plain and unambiguous terms of the statute is that, under § 21-20,166(1), the corporation may elect or, if the corporation fails to elect, one or more shareholders may elect to purchase the petitioning shareholder's shares at fair value. Under § 21-20,166(3), if the parties reach an agreement, the court shall enter an order directing the purchase of the petitioner's shares upon the terms and conditions agreed to by the parties. If the parties are unable to reach an agreement, then under § 21-20,166(4), the court shall determine the fair value of the petitioner's shares, and under § 21-20,166(5)(a), the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate. Under § 21-20,166(5)(a), "[i]nterest may be allowed," subject to one exception that "if the court finds that the refusal of the petitioning shareholder to accept an offer of payment was arbitrary or otherwise not in good faith, no interest shall be allowed." The word "may" when used in a statute will be given its ordinary, permissive, and discretionary meaning unless it would manifestly defeat the statutory objective.[35] Section 21-20,166(5)(a) means what it says. Under § 21-20,166(5)(a), the court is authorized but is not required to award interest. But if the court finds that the petitioning shareholder refused an offer arbitrarily or otherwise not in good faith, the court is not authorized to award interest.

Section 45-103.02(1) is inapplicable, because it contemplates different procedures and a different interest rate. Streck's argument that the RRT's claim must be liquidated to recover prejudgment interest is immaterial.[36] A claim is liquidated for purposes of prejudgment interest when there is no reasonable controversy as to both the amount due and the plaintiff's

---

[35] *Brumbaugh v. Bendorf*, 306 Neb. 250, 945 N.W.2d 116 (2020).

[36] See, e.g., *AVG Partners I, supra* note 9; *Weyh, supra* note 9.

right to recover.[37] We agree with the RRT's interpretation that § 21-20,166(5)(a) provides for an interest award despite the fact that, under the procedures established by the Legislature for a proceeding to purchase a petitioning shareholder's shares, the amount due is in controversy, making the petitioner's claim by definition unliquidated.

Nothing within § 21-20,166 requires the petitioning shareholder to make a demand for payment before trial or include a request for interest in its pleadings. Section 21-20,166(1) is unique in that the proceedings are initiated by the purchasing party's filing of an election. Section 21-20,166 does not require that the petitioning shareholder file a responsive pleading. While notice of a request to recover prejudgment interest is encouraged, compliance with Neb. Ct. R. Pldg. § 6-1108(a) is not determinative where entitlement to interest is based on statute and the adverse party had notice and an opportunity to be heard prior to judgment.[38] It is clear that Streck had notice of potential liability for prejudgment interest prior to electing to purchase the RRT's shares.

Having rejected Streck's prejudgment interest arguments based upon § 45-103.02(1), the only remaining issue that we must determine is whether the RRT refused an offer of payment arbitrarily or otherwise not in good faith. We note that Streck has not argued that interest should commence on a different date.

The only evidence of an offer made by Streck is its February 2015 offer of approximately $220 million, which included an $80 million discount for lack of control and lack of marketability. Streck argues that the RRT should be precluded from an interest award, because the RRT never responded to the February 2015 offer and the RRT delayed the litigation by challenging Streck's election and would not agree to go forward with trial during the pendency of Stacy's appeal.

---

[37] *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013).

[38] *AVG Partners I, supra* note 9.

We have not been presented with evidence that Streck made a realistic offer; as such, we cannot conclude that the RRT's failure to accept an offer was arbitrary or not in good faith. Allegedly vexatious litigation conduct is not relevant to an award of prejudgment interest when the issue is good faith rejection of an offer.[39] As such, Streck's arguments are unconvincing. This assignment of error is without merit.

### 4. Payment Order

Streck assigns that the district court erred in refusing to allow Streck to make installment payments to satisfy the judgment. Section 21-20,166(5)(a) states that "[u]pon determining the fair value of the shares, the court shall enter an order directing the purchase upon such terms and conditions as the court deems appropriate, which may include payment of the purchase price in installments when necessary in the interest of equity . . . ." The district court ordered Streck to purchase the RRT's shares within 10 days and overruled Streck's request to make installment payments.

Streck's request was based on an affidavit from its CFO, which stated that due to the size of the judgment, Streck would be unable to obtain the necessary funds within 10 days. In rejecting Streck's request, the court found that Streck's evidence lacked credibility and was contrary to representations Streck previously made to the court, as well as assurances made by Streck in the SLC report that it would be able to pay the purchase price. The court found that Streck had an extended period to plan for the payment and that Streck had come to the court with unclean hands.

For purposes of disposing of Streck's assignment of error regarding the court's payment order, we need not decide whether Streck's representations to the trial court rose to the level of unclean hands. Suffice it to say that the trial court was not swayed by Streck's stated need for installment payments.

---

[39] See, e.g., *Matter of Carolina Gardens v. Menowitz*, 238 A.D.2d 189, 655 N.Y.S.2d 536 (1997).

The South Dakota Supreme Court interpreted a statute similar to § 21-20,166(5)(a) and determined that the language permits a trial court discretion in requiring a lump-sum payment or installment payments.[40] The South Dakota court then employed an abuse of discretion standard of review to determine whether the trial court erred in ordering installment payments.[41]

Here, the trial court found that Streck's request was not in the interests of equity. The court, having conducted the bench trial and presided over the case for an extended period of time, was in the best position to determine the appropriate terms and condition of payment. We give significant weight to the court's credibility determination.[42] Nothing within our record supports Streck's contention that the trial court abused its discretion in ordering a lump-sum payment. This assignment of error is without merit.

## V. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Affirmed.

Miller-Lerman and Stacy, JJ., not participating.

---

[40] *Link v. L.S.I., Inc.*, 793 N.W.2d 44 (S.D. 2010).

[41] *Id.*

[42] See *Anderson, supra* note 5.