Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2022 09:08 AM CDT

Karen Bohac, Personal Representative of
the Estate of Marlene A. Benes, deceased,
appellant and cross-appellee, v. Benes
Service Co., a Nebraska corporation,
appellee and cross-appellant.
___ N.W.2d ___

Filed January 14, 2022.    No. S-21-133.

1. **Equity: Stock: Valuation.** A proceeding under the provisions of Neb.
   Rev. Stat. § 21-2,201 (Cum. Supp. 2020) to determine the fair value of
   a petitioning shareholder's shares of stock is equitable in nature.
2. **Equity: Appeal and Error.** An appellate court reviews an equitable
   action de novo on the record and reaches a conclusion independent of
   the factual findings of the trial court; however, where credible evidence
   is in conflict on a material issue of fact, the appellate court considers
   and may give weight to the circumstance that the trial court heard and
   observed the witnesses and accepted one version of the facts rather
   than another.
3. **Statutes: Appeal and Error.** Statutory interpretation is a matter of law,
   in connection with which an appellate court has an obligation to reach
   an independent, correct conclusion irrespective of the determination
   made by the court below.
4. **Corporations: Appeal and Error.** In ordering the terms of payment
   under Neb. Rev. Stat. § 21-2,201(e) (Cum. Supp. 2020), an appellate
   court will review for abuse of discretion.
5. **Corporations: Valuation: Words and Phrases.** While the Nebraska
   Model Business Corporation Act's election-to-purchase provisions
   do not explicitly define "fair value," the act's provisions governing
   appraisal rights state that "fair value" means the value of the corpora-
   tion's shares determined using customary and current valuation concepts
   and techniques generally employed for similar businesses in the context
   of the transaction requiring appraisal.

6. **Statutes: Legislature: Presumptions.** In enacting a statute, the Legislature is presumed to know the general condition surrounding the subject matter of the legislative enactment, and it is presumed to know and contemplate the legal effect that accompanies the language it employs to make effective the legislation.

7. **Statutes: Judicial Construction: Legislature: Presumptions: Intent.** Where a statute has been judicially construed and that construction has not evoked an amendment, it is presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.

8. **Corporations: Merger.** A dissenting minority shareholder's right to a fair value appraisal can be triggered merely by the majority's benign decision to engage in a merger or some other corporate transaction. Minority shareholders in these cases are protected from discounts for lack of marketability or minority status, not because there has been fault but simply to protect the vulnerability of the dissenter.

9. **Corporations: Valuation.** A "going concern" premise of value is used in a fair value determination when the subject company is expected to continue to operate into the future.

10. ____: ____. A "liquidation" premise of value is used in a fair value determination when the business is not expected to continue, and it requires a determination of the net amount that would be realized if the business is terminated and the assets are sold piecemeal.

11. **Corporations: Valuation: Words and Phrases.** The asset-based approach is a type of methodology that can be used in fair value determinations. It is a general way of determining a value indication of a business' assets and/or equity based directly on the value of the assets of the business less liabilities.

12. ____: ____: ____. The asset-based approach is generally applied when valuing a business whose operations require significant investment in fixed assets.

13. ____: ____: ____. The income approach is a type of methodology that can be used in fair value determinations. It is a general way of determining a value indication of a business' assets and/or equity based on the future, projected cashflow of a company.

14. ____: ____: ____. The market approach is a type of methodology that can be used in fair value determinations. It is a general way of determining a value indication of a business' assets and/or equity by comparing the subject to similar investments that have been sold.

15. **Legislature: Intent.** The intent of the Legislature is expressed by omission as well as by inclusion.

Appeal from the District Court for Saunders County: Christina M. Marroquin, Judge. Affirmed in part, vacated in part, and in part reversed and remanded with directions.

Jovan W. Lausterer, of Bromm, Lindahl, Freeman-Caddy & Lausterer, for appellant.

Sheila A. Bentzen and Adam J. Kost, of Rembolt Ludtke, L.L.P., for appellee.

Miller-Lerman, Cassel, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

Leonard and Marlene A. Benes formed the Benes Service Co. (BSC) in 1966. Their children assisted in the day-to-day operations and eventually joined as stockholders of varying degrees. After Leonard passed away, four of the couple's sons took over active management. After Marlene's death, her ownership interest transferred to the couple's daughters through her estate (the Estate). Karen Bohac, the personal representative of the Estate and one of the couple's daughters, began investigating BSC and its corporate practices, later filing a petition for dissolution. BSC responded with an election to purchase in lieu of dissolution.

Trial was held on the matter to determine fair value of the Estate's 14.84 percent interest in BSC. The trial court found that the fair value of 14.84 percent of BSC was worth $2,886,790. The district court declined to award Bohac expenses, attorney fees, and prejudgment interest, and it provided for payment of the judgment in annual installments over 5 years. Bohac appealed, and BSC cross-appealed, at which time we moved this appeal to our docket.

We affirm in part, vacate in part, and in part reverse and remand with directions to the district court to recalculate the fair value of BSC and the Estate's 14.84 percent interest in

accordance with this opinion and to set new payment terms according to such recalculated value.

## II. BACKGROUND

BSC is a family-owned business consisting of both a farm implement division and a farming operation, organized as a C corporation in the State of Nebraska and formed in 1966 by Leonard and Marlene. Leonard passed away in 2011, at which time four of Leonard and Marlene's five sons took over the active management of the company. Marlene passed away in August 2017. At the time of her death, four of the sons each owned approximately 20 to 21 percent of BSC, while Marlene owned a 14.84 percent interest in BSC. Each of the couple's six daughters are devisees under Marlene's will and would receive equal benefit from the Estate's 14.84 percent interest. One of the daughters was employed by BSC for many years; she and her husband each hold a separate .61 percent interest in BSC.

Bohac was Marlene's power of attorney and became personal representative of the Estate upon Marlene's death. Bohac first began investigating BSC in order to file a tax return for the Estate. Upon investigation of BSC's business practices, Bohac filed a petition for judicial dissolution on September 20, 2018. Bohac alleged that four of the sons "acted in an illegal, oppressive and/or fraudulent manner" in multiple circumstances: They were not holding required meetings, they were not obtaining director and stockholder approval for major transactions, they were not properly reporting income, and they were engaging in self-dealing activities, among other allegations.

BSC filed an answer denying these allegations and then timely filed an election to purchase the Estate's 14.84 percent of common stock in lieu of judicial dissolution of the company. Based on this filing, Bohac was obligated to sell the Estate's interest in lieu of dissolution pending a determination of fair value of such interest. The parties could not come to an

agreement as to the fair value of the 14.84 percent interest, and so a trial was held wherein the district court was tasked with making such determination.

After an evidentiary hearing, the district court found that the fair value of the Estate's 14.84 percent share of BSC was $2,886,790 as of September 19, 2018, the day before the petition for dissolution was filed. The district court declined to award Bohac expenses, attorney fees, and prejudgment interest, and it provided for payment of the judgment in annual installments over 5 years.

Bohac appealed, and BSC cross-appealed. We thereafter moved this appeal to our docket.

## III. ASSIGNMENTS OF ERROR

Bohac assigns that the district court erred in (1) failing to apply the definition of "fair value" as set forth in Neb. Rev. Stat. § 21-2,171(3) (Cum. Supp. 2020); (2) applying lack of marketability and minority discounts to an asset approach as a going concern; (3) failing to find that Bohac had probable grounds for relief entitling the Estate to an award of expenses pursuant to Neb. Rev. Stat. § 21-2,201(e) (Cum. Supp. 2020); (4) failing to award Bohac interest starting on September 19, 2018, pursuant to § 21-2,201(e); and (5) granting BSC 5 years to make annual, interest-free payments.

On cross-appeal, BSC assigns that the district court erred in applying the asset-based approach over the income-based approach in its determination of the fair value of BSC.

## IV. STANDARD OF REVIEW

[1,2] A proceeding under the provisions of § 21-2,201 to determine the fair value of a petitioning shareholder's shares of stock is equitable in nature.[1] An appellate court reviews an equitable action de novo on the record and reaches a conclusion independent of the factual findings of the trial court;

---

[1] *Anderson v. A & R Ag Spraying & Trucking*, 306 Neb. 484, 946 N.W.2d 435 (2020).

however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstance that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[2]

[3] Statutory interpretation is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determination made by the court below.[3]

[4] In ordering the terms of payment under § 21-2,201(e), an appellate court will review for abuse of discretion.[4]

## V. ANALYSIS

### 1. What Is "Fair Value" of The Estate's 14.84 Percent Interest in BSC?

The issue of determining fair value of the Estate's 14.84 percent interest in BSC is a multistep analysis. This court must first consider the definition of "fair value" as applied to an election to purchase shares in lieu of judicial dissolution. Second, we must consider whether this definition of fair value includes, excludes, or has no effect on the applicability of discounts for lack of marketability and control.

Third, we must determine the premise of value that will apply; here, the options include either "as a going concern" or "as if in liquidation." Fourth, we must decide whether the principle of highest and best use mandates the application of a certain methodology to value BSC and then apply the selected methodology to the determined value of the company's assets, income, or market value to come to a final conclusion as to the fair value of both BSC and the Estate's 14.84 percent interest in BSC. Each component of this analysis is included

---

[2] *Id.*

[3] *Id.*

[4] See *Wayne L. Ryan Revocable Trust v. Ryan*, 308 Neb. 851, 957 N.W.2d 481 (2021) (citing *Link v. L.S.I., Inc.*, 793 N.W.2d 44 (S.D. 2010)).

within our fair value determination and is therefore reviewed de novo with weight given to the trial court for determinations of credibility.[5]

### (a) "Fair Value" Definition

In her first assignment of error, Bohac assigns that the district court erred in failing to apply the definition of "fair value" as set forth in § 21-2,171(3) to its calculation of the Estate's 14.84 percent interest in BSC. In its order, the trial court referred to definitions previously applied under Neb. Rev. Stat. § 21-20,166 (Reissue 2012); however, this statutory section was repealed prior to commencement of this suit and does not control this issue.[6] Because this definition will impact many other steps in the valuation analysis, it is essential that we define "fair value" before analyzing the value of the Estate's 14.84 percent interest in BSC.

Bohac, on behalf of the Estate, initially brought this action as a petition for dissolution pursuant to Neb. Rev. Stat. § 21-2,197 (Cum. Supp. 2020). In response, BSC filed an election to purchase in lieu of dissolution, as permitted by § 21-2,201. These two statutes are each within Neb. Rev. Stat. §§ 21-2,184 through 21-2,202 (Cum. Supp. 2020) (Part 14) of the Nebraska Model Business Corporation Act (NMBCA).

As provided by the NMBCA, if the parties engaged in an election to purchase in lieu of dissolution cannot reach an agreement within 60 days, the court shall stay dissolution proceedings and "determine the *fair value* of the petitioner's shares" as of the day before the petition for dissolution was filed or as of such other date as the court deems appropriate.[7] But the term "fair value," as used within § 21-2,201, is not defined either in this section or elsewhere within Part 14 of the NMBCA.

---

[5] See *Anderson v. A & R Spraying & Trucking, supra* note 1. See, also, *Wayne L. Ryan Revocable Trust v. Ryan, supra* note 4.

[6] See § 21-20,166 (Cum. Supp. 2014).

[7] § 21-2,201(d) (emphasis spplied).

While not defined within Part 14, fair value is defined within Neb. Rev. Stat. §§ 21-2,171 through 21-2,183 (Cum. Supp. 2020) (Part 13) regarding appraisal rights at § 21-2,171(3). For purposes of appraisal rights,

> [f]air value means the value of the corporation's shares determined:
>
> (i) Immediately before the effectuation of the corporate action to which the shareholder objects;
>
> (ii) Using customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal; and
>
> (iii) Without discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to subdivision (a)(5) of section 21-2,172.[8]

Bohac urges us to adopt this definition in whole, to be used identically in Part 14. BSC urges us to instead abide by the limitation set forth by § 21-2,171, that definitions provided therein apply only to Part 13. BSC also points to official commentary, provided within a prior version of the standardized Model Business Corporation Act, from which the NMBCA is derived. That commentary stated, in part, "[a]s the introductory clause of section 13.01 notes, the definition of 'fair value' applies only to chapter 13."[9]

There are two issues with BSC's argument regarding the official Model Business Corporation Act commentary. First, this official commentary to the model act was not adopted by the Legislature as part of the NMBCA. Second, as stated within another section of the same official commentary relied upon by BSC, "Section 14.34 does not specify the components of 'fair value,' and the court may find it useful to consider valuation methods that would be relevant to a judicial appraisal

---

[8] § 21-2,171(3).

[9] 3 Model Business Corporation Act Ann. § 13.01, official comment at 13-12 (4th ed. 2013).

of shares under section 13.30."[10] Thus, even the standardized Model Business Corporation Act recognizes that courts must sometimes look to Part 13 for guidance when defining these important terms. And that is exactly what this court has done previously when faced with the issue of defining fair value within the context of Part 14.

In *Anderson v. A & R Ag Spraying & Trucking*,[11] two men formed a corporation. After one of the shareholders passed away, his interest in the corporation passed to his wife, who then petitioned the court for judicial dissolution pursuant to § 21-2,197. The other shareholder thereafter filed an election to purchase the corporation in lieu of judicial dissolution pursuant to § 21-2,201.

[5] In *Anderson,* we stated:

> While the [NMBCA's] election-to-purchase provisions do not explicitly define "fair value," the act's provisions governing appraisal rights state that "fair value" means the value of the corporation's shares determined "[u]sing customary and current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal[.]"[12]

We then applied this definition, originating in Part 13 of the NMBCA, to the election to purchase brought by the other shareholder under Part 14.

*Anderson* mirrors this case, where the procedural actions were similar both in form and statutory scheme. The cases involved similar facts and circumstances surrounding a closely held corporation. The analysis only differs in application of the income approach methodology rather than the asset approach. Thus, like *Anderson*, we will apply Part 13's definition of fair value to this action, even though it originated under Part 14. As a result, fair value shall be determined using customary and

---

[10] *Id.*, § 14.34, official comment at 14-170.

[11] *Anderson v. A & R Ag Spraying & Trucking, supra* note 1.

[12] *Id.* at 493, 946 N.W.2d at 442.

current valuation concepts and techniques generally employed for similar businesses in the context of the transaction requiring appraisal.

### (b) Discounts for Lack of Marketability and Control

We next consider the implications that this definition of fair value will have on the applicability of discounts for lack of control and lack of marketability. Bohac, in her second assignment of error, assigns that the district court erred in applying lack of marketability and minority discounts. Bohac asserts that the definition of fair value from Part 13 should be adopted in full, including § 21-2,171(3)(iii), which states that fair value is calculated "[w]ithout discounting for lack of marketability or minority status except, if appropriate, for amendments to the articles pursuant to subdivision (a)(5) of section 21-2,172."

The exception described by § 21-2,172(a)(5) allows for application of the marketability or minority discounts in an appraisal action where the shareholder has requested payment for fair value of their shares based on certain foreseeable corporate actions, such as an amendment to the articles of incorporation, merger, or a disposition of corporate assets pursuant to the bylaws. Section 21-2,172(a)(5) is not relevant in this matter, because the election to purchase in lieu of dissolution is not named by that subsection and is not similar to the type of foreseeable actions listed in that subsection. Adoption of the fair value definition provided by § 21-2,171(3) would thus preclude discounts in an elect-to-purchase action, as no exception would apply.

We agree with Bohac and hold that the determination of fair value for purposes of an elect-to-purchase action under Part 14 shall be defined using the definition of fair value, in its entirety, as provided within Part 13 at § 21-2,171(3).

### (i) "Fair Value"

Our conclusion that fair value for purposes of an election-to-purchase action under Part 14 should be calculated without

discounting for lack of marketability or minority status is informed by the use of the word "fair value" in contrast to another term that appears frequently in Nebraska statute—"fair market value."[13] Like other courts and commentators, we find that the use of the term "fair value" instead of "fair market value" in this context suggests "disapproval of a fair market value approach and the discounting that would accompany it."[14]

## (ii) Official Commentary and NMBCA

BSC asserts that lack of marketability and minority discounts are both applicable and appropriate here, once again referring to the official commentary discussed above and provided within a prior version of the standardized Model Business Corporation Act. As this commentary states, "the definition of 'fair value' applies only to chapter 13. See the Official Comment to section 14.34 which recognizes that a minority discount may be appropriate under that section."[15] There are three issues with BSC's argument.

[6] First and most important, the referenced official commentary, as stated previously, was not adopted by the Legislature when it passed the NMBCA. In enacting a statute, the Legislature is presumed to know the general condition surrounding the subject matter of the legislative enactment, and it is presumed to know and contemplate the legal effect that accompanies the language it employs to make effective the legislation.[16] If the Legislature intended for discounts to be expressly applicable to elect-to-purchase actions, it could have chosen either to amend the model language accordingly

---

[13] See, e.g., Neb. Rev. Stat. § 21-2448(2) (Reissue 2012).

[14] Douglas K. Moll, *Shareholder Oppression and "Fair Value": Of Discounts, Dates, and Dastardly Deeds in the Close Corporation*, 54 Duke L.J. 293, 336 (2004).

[15] 3 Model Business Corporation Act Ann., *supra* note 9.

[16] *J.S. v. Nebraska Dept. of Health & Human Servs.*, 306 Neb. 20, 944 N.W.2d 266 (2020).

or to adopt the official commentary into our statutory scheme. It chose to do neither.

[7] Conversely, we have previously recognized that where a statute has been judicially construed and that construction has not evoked an amendment, it is presumed that the Legislature has acquiesced in the court's determination of the Legislature's intent.[17] In *Anderson v. A & R Ag Spraying & Trucking*, this court considered the Part 13 definition of fair value as guidance in valuing a corporation in an elect-to-purchase action brought under Part 14.[18] The Legislature has made no amendment since that time which would have precluded the application of the Part 13 definition to actions brought under Part 14, and so we will presume that the Legislature has acquiesced in our determination of the Legislature's intent in this matter. Until the Legislature amends the NMBCA or indicates a contrary intent, we will continue to apply the fair value definition in Part 13 to actions brought under Part 14, in its entirety and as written.

Second, even if we, for the sake of argument, consider the commentary provided by the Model Business Corporation Act, in the 2013 version, as well as the 2016 and 2020 versions, it indicates that discounts for lack of marketability or minority status are inappropriate in most appraisal actions, because such discounts "give the majority the opportunity to take advantage of minority shareholders who have been forced against their will to accept the appraisal-triggering transaction."[19]

Applying that rationale to this case, the result would be similar: Bohac and the rest of the other devisees of the Estate have been forced to accept BSC's election to purchase even though Bohac sought the dissolution of the entire corporation. Discounts such as those sought by BSC are inappropriate

---

[17] *Estate of Schluntz v. Lower Republican NRD*, 300 Neb. 582, 915 N.W.2d 427 (2018).

[18] *Anderson v. A & R Ag Spraying & Trucking, supra* note 1.

[19] 3 Model Business Corporation Act Ann., *supra* note 9.

where, as here, BSC was able to force Bohac and the other minority shareholders to accept this transaction and thus held a distinct advantage over them.

Finally, the commentary in § 13.01 of the Model Business Corporation Act mentions only that a *minority* discount may be appropriate under § 14.34 of the act, but does not mention discounts for *lack of marketability* or otherwise indicate that such a discount may be applicable to actions under § 14.34. And § 14.34 also expressly mentions only a minority discount. We decline to assume that lack of marketability discounts are applicable to actions brought under § 14.34, where not envisioned in the language of that section. Contrary to BSC's contentions, the Model Business Corporation Act official commentary does not make clear that discounts are applicable and appropriate in this case. Rather, that commentary indicates that *all* discounts for lack of marketability should be excluded and that only minority discounts should be considered.

### (iii) Oppression Need Not be Proved to Justify Exclusion of Discounts

The trial court, in determining the applicability of discounts, stated that this action was "not analogous to a dissenting sharehold[er] exercising appraisal rights because this is not a case involving wrongful conduct by majority shareholders or minority shareholder oppression" and that

> given the totality of evidence before the Court, the Court cannot find that the majority shareholders engaged in wrongful conduct or oppression of the minority shareholders based on this limited testimony. Furthermore, the context of this action is one brought by the minority shareholder seeking to be bought out for distribution of the value of shares within the Estate. Therefore, the application of discounts must be determined based on equitable principles.

This is an inaccurate representation of this case. Bohac did allege wrongful and oppressive conduct by the majority

shareholders when she, on behalf of the Estate, filed a petition for dissolution of BSC. It was BSC that exercised its right to elect to purchase in lieu of dissolution, which compelled the Estate to sell its interest in the company.

That there was "limited testimony" on oppression, as indicated by the trial court, is expected. As agreed by both parties, the sole issue tried to the court was the determination of "'fair value' of [Bohac's] 14.84% stock interest in [BSC] as of September 19, 2018," under § 21-2,201(d). It is misleading to say the action was "brought by the minority shareholder seeking to be bought out," when Bohac actually sought dissolution and alleged oppression from the beginning. It is unsurprising that such evidence was not presented in further detail at trial because the issue of oppression was not tried to the court at all.

[8] Further, dissenter's rights statutes in many jurisdictions do not require the minority to prove that the majority has engaged in blameworthy conduct in order to receive protections. In appraisal cases, for example, a dissenting minority shareholder's right to a fair value appraisal can be triggered merely by the majority's benign decision to engage in a merger or some other corporate transaction.[20] Minority shareholders in these cases are protected from discounts for lack of marketability or minority status, not because there has been fault but simply to protect the vulnerability of the dissenter.[21]

Even if we were to assume that the Legislature did not intend for us to apply Part 13's definitions, including the

---

[20] Moll, *supra* note 14.

[21] See, e.g., *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 364 (Colo. 2003) (adopting enterprise value approach to fair value and noting that such interpretation is "clear majority view" in appraisal cases); *Lawson Mardon Wheaton, Inc. v. Smith*, 160 N.J. 383, 401, 734 A.2d 738, 748 (1999) ("equitable considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholders' stock in an appraisal action").

specific exclusion of discounts, to evaluate actions brought under Part 14, principles of equity would still require us to prevent application of discounts where the dissenter holds a minority interest and did not itself engage in oppressive, illegal, or fraudulent conduct. To find otherwise would encourage majority oppression and would double-penalize minority interest holders who choose to exercise their rights to petition for dissolution when they feel the majority has engaged in oppressive conduct. We therefore conclude that neither discount shall apply.

### (c) Premise of Value

We turn next to the determination of the premise of value to be applied in this case.

[9,10] There are two premises of value that might apply to this type of action: "as a going concern" or "as if in liquidation." A going concern premise of value is used in a fair value determination when the subject company is expected to continue to operate into the future. A liquidation premise of value is used in a fair value determination when the business is not expected to continue, and it requires a determination of the net amount that would be realized if the business is terminated and the assets are sold piecemeal.

Within the valuations provided by both experts, Janet Labenz and Matt Stadler, as well as within the determination by the district court, the selection as to premise of value was intermingled with a discussion of the selection of valuation methodologies (explained in more detail below). The premise of value in this case was clearly as a going concern. Majority stockholders of BSC repeatedly indicated that they planned to continue the company into the future and had no plans to dissolve the company for any reason. BSC filed an election to purchase the Estate's shares in lieu of dissolution so that it could continue business. The going concern premise must therefore be applied to this valuation.

(d) Valuation Methodology

Having identified the standard and premise, this court also must select a methodology before a final valuation can be calculated. In its assignment of error on cross-appeal, BSC assigns that the district court erred in applying the asset-based approach over the income-based approach.

[11,12] There are three methods to value shares of a company: the asset-based approach, the income approach, and the market approach. According to Stadler, the expert for Bohac, the asset-based approach is "[a] general way of determining a value indication of a business's assets and/or equity using one or more methods based directly on the value of the assets of the business less liabilities." Under the asset-based approach, each asset is assigned a fair market value based on its worth if the entity were sold on an asset-by-asset basis. Liabilities are deducted from the total value of assets to arrive at the fair market value of the business. The asset-based approach is generally applied when valuing a business whose operations require significant investment in fixed assets.

[13] Stadler explained that the income approach is "[a] general way of determining a value indication of a business's assets and/or equity using one or more methods wherein a value is determined by converting anticipated benefits." This approach is based on the future, projected cashflow of a company, rather than the assets. It assumes an investor could choose to invest in the company or in a business with similar investment characteristics, and considers historical data to project future cashflow.

[14] Stadler further explained that the market approach is "[a] general way of determining a value indication of a business's assets and/or equity using one or more methods that compares the subject to similar investments that have been sold." At trial, the expert opinions provided by both parties agreed that the market approach was inapplicable, because there were insufficient comparable corporations or prior sales that could be used to draw a comparison. This leaves us with a

choice of either the asset- or income-based approaches or some combination of the two.

Bohac argues that the principal of "highest and best use" requires application of the asset approach, because the asset-based approach yielded a higher valuation amount from both experts at trial. BSC argues that this understanding of the principle of highest and best use is misplaced and artificially inflates the value of BSC. BSC cites New York case law that "rejected application of the higher valuation because it did not account for the reality of the underlying situation of the corporation and required presumptions not based on actual facts."[22]

Labenz, the expert for BSC, stated in her report that under the principle of highest and best use, "the value of a company is deemed to be the higher of the two values determined under a going concern or a liquidation premise." This would mean that under the highest and best use principle, where the higher value came from liquidation, the company must be treated "as if in liquidation." However, this is inconsistent with the testimony of the parties that BSC will continue to operate into the future. And Labenz chose to continue her valuation based on the lower of the two numbers presented, $13,021,000 versus $18,043,000. As noted by the district court, Labenz "does not explain why the court should not adopt her conclusion with the higher value under the asset approach."

By contrast, Stadler, the expert for Bohac, conducted a valuation of BSC and the Estate's interest using an asset approach and a going concern premise of value. This analysis takes into account the significant assets held by the company, as well as the company's assertion that it will continue to operate into the future. Stadler explained the reason for discrepancies between his own report and that of Labenz, referring to a renowned valuation expert who posits that analysts will often "mistakenly confuse the use of asset based approach with a liquidated premise of value when it can, in fact, be used with all

---

[22] Reply brief for appellee at 2.

premises of value including as a going concern." Labenz had testified at trial that she agreed with the valuation expert, but "did not explain why she opted not to use the going concern as a premise of value herein under her asset approach analysis."

BSC has significant assets. The principle of highest and best use does not require that we apply a liquidation premise of value when such would be contrary to facts suggesting that the company was a going concern. Due to these many factors, the correct methodology to adopt for valuation of BSC is an asset approach.

(e) Value Determinations

At trial, the parties presented multiple witnesses and experts to testify about the assets held by BSC, including parts inventory and equipment. They also testified to the chemical rebates BSC receives on chemicals that are sold and the potential tax liabilities that BSC would incur under the asset or income approaches. As with the issues discussed above, this subissue continues as part of the overall determination of fair value of the Estate's interest in BSC, and the standard of review is de novo with weight given to the trial court's determinations of credibility. Because the trial court presided over this matter and observed witness and expert testimony, the trial court is best situated to make determinations regarding the credibility of valuations provided.

(i) Equipment

As to the value of equipment, a licensed auctioneer and certified appraiser testified regarding an appraisal that he conducted for the Estate, whereas BSC offered a valuation of equipment prepared by the general manager for BSC. BSC's general manager also testified that he regularly priced equipment owned by BSC by using information listed by an online company that lists auction results for farm equipment.

The trial court ultimately found the valuation of the auctioneer to be more credible than that of BSC's general manager, noting that "[his] methodology involved multiple comparable

sales, he physically viewed the property to ascertain its condition, he is an independent consultant, he holds a certification in appraisals, and he has significant experience in the valuation of such property." We defer to the trial court's determination of credibility and find that the value of equipment is $11,663,325, as valued by the auctioneer.

### (ii) Parts Inventory

As to the value of the parts inventory held by BSC, Randy Koski testified for the Estate. Koski is a certified public accountant with a bachelor's degree in business administration with an accounting concentration, as well as a minor in economics. Koski testified to his experience in all accounting aspects for implement dealerships over the last 20 years.

BSC offered testimony from Chris Benes, the president of BSC, as well as a valuation report he prepared based on "what a third party would pay for the parts." Chris' report did not use a method of valuing parts that included buy-backs by the manufacturer, even though the court "heard a great deal of evidence about the buy-back laws under Neb. Rev. Stat. §87-706 and 707." One of Leonard and Marlene's daughters, who worked as the parts manager for BSC for almost 40 years also testified that "there would be parts on the inventory list that were not returnable to the manufacturer but were still saleable" but that these items were "'very minute'" and were about 1 percent of the inventory.

Ultimately, the trial court found that the valuation provided by Koski was more credible that that provided by Chris. The court noted:

> Koski's methodology included values that are realized under the buy-back laws, taking into account that this is not a liquidation, so the 15 % restocking charge will actually not be incurred. Further, the valuation accounted for all saleable parts, and it does not exclude items that haven't sold in the last two years, as those still hold a value. Further, he is an independent consultant and has significant experience in the valuation of such property.

We defer to the trial court's determination of credibility and find that the value of parts inventory is $1,993,033, as valued by Koski.

### (iii) Chemical Rebate

Next is a determination of value for the chemical rebate that BSC receives when chemicals are sold to BSC clients. Chris testified that the financial benefits of the rebate are never realized by BSC, because the rebates are passed on to customers through the pricing of the chemicals for sale. The trial court noted that "[t]here is not an accurate accounting before the Court to explain what percentage [BSC] discounts the chemicals in comparison to how much it receives from the rebate." The court also noted that Chris had testified to an inventory kept by BSC regarding the rebate that uses a "fictitious number some percentage less than what was actually paid" and that, as aptly described by Chris, this was "'lazy or poor accounting.'" We again defer to the trial court's determination of credibility regarding testimony about the rebate and agree that the chemical rebate should be categorized as an account receivable by BSC.

### (iv) Tax Liabilities

The last value determination to be addressed is the issue of tax liabilities.

In schedule 10 of her appraisal of BSC, Labenz assigned an income tax liability of almost $6.6 million and assumed selling expenses of about $3.5 million. Conversely, Stadler's appraisal recorded a deferred income tax on the sale of fixed assets for 10 years based on the assessment that it is unlikely the assets will be sold in the next 10 years, if ever, and instead will be "passed down generationally."

The trial court found Stadler's assessment of a potential tax liability to be more credible than that of Labenz, because Labenz' report "assumes an immediate tax consequence during a liquidation" which will not be "realized by [BSC] since the Company will continue to operate rather than dissolve."

We again defer to the trial court's determination of credibility, where it accepted Stadler's determination of potential tax liability.

### (f) Final Fair Value Calculation

Based on the above material, we conclude that BSC should be valued according to the fair value standard laid out at § 21-2,171(3). Moreover, we find that neither minority nor lack of marketability discounts is applicable. Further, BSC must be valued based on a going concern premise of value, using the asset-based approach for methodology. As a result, we reverse, and remand this issue to the district court, with directions to recalculate the fair value of BSC and the Estate's 14.84 percent interest in accordance with this opinion.

### 2. Bohac's Claim for Reimbursement of "Expenses"

In her third assignment of error, Bohac asserts that the district court erred in failing to find that Bohac had probable grounds for relief entitling the Estate to an award of expenses pursuant to § 21-2,201(e). Bohac claims that she is entitled to more than $30,000 for costs incurred, plus more than $87,849.33 in attorney fees and costs, under the authority of § 21-2,201(e) and our opinion in *Detter v. Miracle Hills Animal Hosp.*[23] Our disposition of this issue requires us to interpret § 21-2,201(e). That section provides:

> Upon determining the fair value of the shares, the court shall enter an order directing the purchase *upon such terms and conditions as the court deems appropriate* . . . . If the court finds that the petitioning shareholder had probable grounds for relief under subdivision (a)(2)(i)(B) or (D) of section 21-2,197, it *may* award expenses to the petitioning shareholder.[24]

[23] See *Detter v. Miracle Hills Animal Hosp.*, 269 Neb. 164, 691 N.W.2d 107 (2005).

[24] § 21-2,201(e) (emphasis supplied).

In interpreting the language of the statute itself, we are required to reach an independent, correct conclusion irrespective of the determination made by the court below. However, in reviewing the contents of an award made pursuant to the statute, our review will be for an abuse of discretion.

Bohac argues that because § 21-2,201(e) uses the term "expenses," the statute permits "not only costs and expert expenses but also attorneys' fees."[25] Bohac refers to *Detter*, where we held that reasonable attorney fees and expenses were recoverable in an election to purchase in lieu of dissolution action, provided that the petitioner could show that the respondent's conduct was illegal, oppressive, or fraudulent in its form or that the corporate assets were being misapplied or wasted.[26]

However, Bohac's argument is flawed. *Detter* interprets § 21-20,166, the predecessor statute to § 21-2,201. Under that language, a court was specifically permitted to "award to the petitioning shareholder reasonable attorney's fees and expenses and fees and expenses of any experts employed by him or her,"[27] if the court found that a petitioning shareholder had probable grounds for relief from oppressive or wrongful conduct. But § 21-20,166 was repealed and replaced with § 21-2,201 in 2014 and no longer includes the language from *Detter* which Bohac relies upon. This change was made pursuant to the adoption of the NMBCA, and this language is still in force today.[28]

[15] The intent of the Legislature is expressed by omission as well as by inclusion.[29] We cannot ignore that the Legislature specifically removed reference to attorney fees when it adopted the NMBCA and repealed and replaced § 21-20,166 with

---

[25] Brief for appellant at 38.

[26] *Detter v. Miracle Hills Animal Hosp., supra* note 23.

[27] § 21-20,166(5)(b) (Reissue 2012).

[28] § 21-2,201.

[29] *In re Estate of Hutton*, 306 Neb. 579, 946 N.W.2d 669 (2020).

§ 21-2,201. Upon our de novo review of this statutory language, we find that Bohac is not entitled to an award of attorney fees.

We note that, while Bohac is not entitled to attorney fees, under certain circumstances, a litigant in her position might be entitled to an award of other expenses. In order to recover expenses under § 21-2,201, the court must find that Bohac, as the petitioning shareholder, had probable grounds for relief. If such grounds for relief exist, the court "may" award expenses to the petitioning shareholder. But we find that the district court's denial of such expenses was not an abuse of discretion.

The record shows that the trial court had opportunity to hear testimony and review evidence presented by Bohac regarding alleged misconduct by the majority shareholders. While Bohac detailed this alleged oppression at length, the record also indicates that there are potentially innocent intentions behind each event. After hearing testimony, observing the witnesses, and reviewing other evidence presented at trial, the trial court accepted one version of the facts over another. We find no evidence that the court abused its discretion on this determination.

### 3. COURT-ORDERED PAYMENT OF JUDGMENT

In her fourth and fifth assignments of error, Bohac asserts that the district court erred in failing to award interest starting on September 19, 2018, pursuant to § 21-2,201(e), and granting BSC 5 years to make annual, interest-free payments.

Section 21-2,201(e) provides that the court, in setting terms of purchase, may include both installment payments and interest, but that neither is required. The court, having conducted the bench trial and presided over the case for an extended period of time, was in the best position to determine the appropriate terms and conditions of payment.[30] We find no abuse of discretion in the trial court's determination of payment terms.

---

[30] See *Wayne L. Ryan Revocable Trust v. Ryan, supra* note 4.

While we find no abuse of discretion, we recognize that the current payment terms reflect the district court's fair value determination; because we have instructed the court to recalculate the fair value of BSC in accordance with this opinion, these payment terms may need to change based on the needs and abilities of both parties. Accordingly, we vacate the judgment amount, including the determination of terms and conditions, and direct that after performing the fair value calculation required by this opinion and based upon the existing record, the district court shall determine the terms and conditions of the purchase, which may include payment of the purchase price in installments, with or without interest, as the court deems appropriate in light of the recalculated purchase price.

## VI. CONCLUSION

We conclude that the district court erred in its determination of the fair value of BSC, both because it did not use the correct definition and because it subjected the Estate's shares to discounts. As such, we vacate the award, and we reverse and remand with directions for further proceedings consistent with this opinion. However, we affirm the district court's denial of attorney fees and other expenses.

Affirmed in part, vacated in part, and in part reversed and remanded with directions.

Heavican, C.J., and Stacy, J., not participating.